UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **MYNOR ABDIEL TUN-COS,** | ) | |
| **and** | ) | |
| **JOSÉ PAJARITO SAPUT,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: _____ |
| **v.** | ) | |
| | ) | |
| **B. PERROTTE, T. OSBORNE, D. HUN YIM,** | ) | |
| **P. MANNEH, and A. NICHOLS,** | ) | |
| **ICE AGENTS** | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1.     This is a civil rights action brought by Plaintiffs Mynor Abdiel Tun-Cos and José Pajarito Saput (collectively, "Plaintiffs") to seek relief for Defendants' violation of their rights, privileges, and immunities secured by the Fourth and Fifth Amendments to the United States Constitution.

2.     As described below, in the early hours of February 17, 2017,  United States Immigration and Customs Enforcement ("ICE") Agents B. Perrotte, T. Osborne, D. Hun Yim, P. Manneh, and A. Nichols (collectively, "Defendants") were at Fairmont Gardens, a multi-building apartment complex located in Annandale, Virginia that is home to many residents of Latino ethnicity. At around 6:25 a.m., the ICE agents seized four men—the Plaintiffs and two other men— as they were attempting to go to work.

3.     The ICE agents violated Plaintiffs' clearly-established constitutional rights by detaining them at length without a reasonable, articulable suspicion that they had violated the immigration laws of the United States.  Defendants had no reasonable suspicion to suspect that Plaintiffs had violated the immigration laws of the United States or any other law.  Rather,

Defendants detained the Plaintiffs because Plaintiffs appeared to be of Latino race or ethnicity and because of their perceived national origin.

4.     Even if Defendants had a reasonable, articulable suspicion that Plaintiffs had violated the immigration laws of the United States, the prolonged and intensive nature of their detention was not "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

5.     Plaintiffs' arrests did not occur in a vacuum. President Trump's January 25, 2017 Executive Order, Enhancing Public Safety in the Interior of the United States (the "January 25, 2017 Executive Order"), Exec. Order No. 13768 of Jan. 25, 2017, 82 Fed. Reg. 8799 (Jan. 30, 2017), was represented by the Trump Administration as an effort to "take the shackles off" ICE agents in their enforcement activities.  Press Briefing by Press Sec'y Sean Spicer #13, WHITE HOUSE OFFICE OF THE PRESS SEC'Y (Feb. 21, 2017) [hereinafter Spicer Press Briefing, Feb. 21, 2017], *available at* https://www.whitehouse.gov/the-press-office/2017/02/21/press-briefing-press-secretary-sean-spicer-2212017-13.  In fact, the resulting activities have led to the unconstitutional arrests of individuals such as Plaintiffs, as has been highly publicized.  Of particular concern are so-called "collateral arrests," wherein ICE agents who are nominally searching for one person detain and/or arrest any other people who happen to be in the area—often based on nothing other than their race, ethnicity, or perceived national origin. *See, e.g.*, NAT'L IMMIGRATION LAW CTR., *President Trump's Raids on Immigrant Communities* (Feb. 27, 2017) [hereinafter NILC, *Trump's Raids*] *available at* https://www.nilc.org/wp-content/uploads/2017/02/ice-raids-and-other-enforcement-actions-2017-02-27.pdf (discussing an increase in collateral arrests).

6.      The United States Department of Homeland Security ("DHS"), during the administration of President George W. Bush, permitted and encouraged collateral arrests.  This policy led to widely documented Fourth and Fifth Amendment violations. *See, e.g.*, Nathan Treadwell, *Fugitive Operations and the Fourth Amendment: Representing Immigrants Arrested in Warrantless Home Raids*, 89 N.C. L. REV. 507, 513–521 (2011) (describing ICE operations of entering home and "rounding up" everyone present); Stella J. Burch, *"Good Reason to Believe": Widespread Constitutional Violations in the Course of Immigration Enforcement and the Case for Revisiting Lopez-Mendoza*, Yale Law School Student Scholarship Papers, at 1124–1139 (2008), *available at* http://digitalcommons.law.yale.edu/student_papers/67 (describing practices and citing cases).

7.      Plaintiffs seek declaratory judgment, compensatory and punitive damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

### Jurisdiction and Venue

8.      The Court has personal jurisdiction over Defendants because Defendants' acts and omissions giving rise to this lawsuit took place in Virginia.

9.      The Court has subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because this action seeks redress for the violation of Plaintiffs' constitutional rights.

10.      Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202.

11.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and 1391(e)(1) because a substantial part of the events giving rise to this claim occurred in the district and because Plaintiffs reside in the district.

## Parties

12.     Plaintiff Mynor Abdiel Tun-Cos is of Latino race and ethnicity.  At all relevant times, he was a resident of the Fairmont Gardens apartment complex in Annandale, Virginia.

13.     Plaintiff José Pajarito Saput is of Latino race and ethnicity.  At all relevant times, he was a resident of the Fairmont Gardens apartment complex in Annandale, Virginia.

14.     Defendants are ICE agents who personally participated in the seizure and arrests of Plaintiffs on February 17, 2017.  Plaintiffs are unaware of the full first names of Defendants and therefore sue those Defendants under their last names as they appear in Plaintiffs' I-213 Forms and the I-213 Form of another individual arrested along with Plaintiffs.[1] Defendants participated in and are directly responsible and liable for the acts and resulting damages alleged in this complaint.  Plaintiffs will amend this complaint to allege Defendants' full names once they have been ascertained.

## Statement of Facts

15.     ICE agents across the country have been encouraged to stop individuals without reasonable suspicion, pursuant to the Trump Administration's efforts to "take the shackles off" ICE agents to free them from "what they went through in the last administration." Spicer Press Briefing, Feb. 21, 2017.  In contrast to the Obama Administration's immigration enforcement policies and practices, which discouraged ICE agents from stopping individuals absent reasonable suspicion that the individuals had violated federal law, the January 25, 2017 Executive Order and implementing guidance from DHS have encouraged a broader set of

---

[1] A Form I–213 is an official record routinely prepared by an immigration officer at the time of the initial processing of an individual suspected of being unlawfully present in the United States.

4

enforcement priorities that "no longer will exempt classes or categories of removable aliens from potential enforcement." *Compare* Memorandum from Sec'y of Homeland Security John Kelly on Enforcement of the Immigration Laws to Serve the National Interest, DEP'T OF HOMELAND SECURITY (Feb. 20, 2017), *available at* https://www.dhs.gov/sites/default/files/publications/ 17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf (explaining DHS's new no-exemptions policy), *with* Memorandum from Sec'y of Homeland Security Jeh Charles Johnson on Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, DEP'T OF HOMELAND SECURITY (Nov. 20, 2014), *available at* https://www.dhs.gov/sites/default/files/publications/ 14_1120_memo_prosecutorial_discretion.pdf (providing more narrow ICE enforcement guidance).

16.     ICE has published statistics showing that its agents have arrested a greater number of noncriminals so far in 2017 as compared to the same time period in 2016.  Many of these are collateral arrests, as has been widely publicized. *See, e.g., ICE ERO Immigration Arrests Climb Nearly 40 Percent*, U.S. IMMIGRATION AND CUSTOMS ENF'T (May 17, 2017), *available at* https://www.ice.gov/features/100-days (noting that non-criminal arrests increased from approximately 4,200 over the first 100 days of 2016 to more than 10,800 in the same period in 2017); Maria Sacchetti, *ICE Immigration Arrests of Noncriminals Double Under Trump*, WASH. POST (Apr. 16, 2017), https://www.washingtonpost.com/local/immigration-arrests-of-noncriminals-double-under-trump/2017/04/16/98a2f1e2-2096-11e7-be2a-3a1fb24d4671_story.html (citing statistics requested from ICE showing significantly greater percentage of noncriminal immigrants arrested between January 20 and March 13, 2017 than

between the same dates in 2016); NILC, *Trump's Raids* (discussing increase in collateral arrests).

17.     Fairmont Gardens is one of the largest multi-building apartment complexes in Annandale, Virginia, a neighborhood long known for its multiethnic population. Most of the residents of Fairmont Gardens are of Latino ethnicity.

18.     Under the Obama administration, ICE agents carried out immigration arrests at Fairmont Gardens multiple times a year, but generally arrested only those persons whom they had come to arrest—i.e., persons as to whom they presumably had a reason to suspect to have violated the immigration laws. They generally did not engage in collateral arrests of third persons based on guesses as to their immigration status or on impermissible criteria such as race, ethnicity, or perceived national origin.

19.     Beginning around February 2017, ICE agents have dramatically increased the number and scope of enforcement actions at Fairmont Gardens. In February and March 2017, for example, ICE targeted Fairmont Gardens residents for enforcement at a frequency well beyond that of any similarly-sized apartment complex in the Annandale, Virginia area. These enforcement actions have included numerous collateral arrests—including those of the Plaintiffs Mr. Tun-Cos and Mr. Pajarito Saput.

20.     On February 17, 2017, at approximately 6:25 AM, Mr. Tun-Cos and Mr. Pajarito Saput, along with one other individual exited their apartment building in Fairmont Gardens to go to work.  Once outside the building, they met another individual who had arranged to carpool with them, and the four of them entered Mr. Tun-Cos's vehicle in the Fairmont Gardens parking lot to drive to work.  All four appeared to be of Latino race or ethnicity.  Mr. Tun-Cos was driving.  None of the individuals were engaged in any criminal activity.

21.     As Mr. Tun-Cos's car pulled out of a parking space, an unmarked black SUV pulled in front of the car and blocked it from moving.  At this point, and for the rest of the encounter, Mr. Tun-Cos and Mr. Pajarito Saput reasonably did not feel free to leave.

22.     Defendants jumped out of the SUV and surrounded Mr. Tun-Cos's car. Defendants each had a gun visible on their waistbands.  Throughout the encounter that morning with Defendants, Mr. Tun-Cos and Mr. Pajarito Saput did not feel free to leave or to refuse Defendants' instructions.  At no time were Mr. Tun-Cos or Mr. Pajarito Saput informed of their legal rights.

23.     After Defendants surrounded Mr. Tun-Cos's car, one or more of the Defendants banged on the car windows and loudly instructed the passengers to lower their windows.  Throughout the encounter, Defendants spoke to Plaintiffs in a mix of English and Spanish, but primarily in English.  Plaintiffs have very limited facility with the English language.

24.     Throughout the encounter in the parking lot, Defendants had no reasonable, articulable suspicion that any of the passengers had violated the immigration laws of the United States or committed any other violation of U.S. law.

25.     Nonetheless, Defendants demanded that each of the four occupants of Mr. Tun-Cos's car produce identification.  Mr. Tun-Cos, Mr. Pajarito Saput, and one of the other individuals in the car complied by providing the identification that they had in their wallets.  The fourth individual in the car was carrying no identification, and thus could not comply.

26.     Defendants ordered the four occupants out of the car.  Mr. Tun-Cos asked if he could park his car, and one Defendant stayed with Mr. Tun-Cos while he parked his car. Another Defendant returned to the ICE SUV with the men's identification.

27.     Two other Defendants said "Let's go to your apartment," and directed the three other passengers to the apartment building. The passengers reasonably believed that they had no choice but to obey the Defendants' command. One Defendant told Mr. Pajarito Saput that they were all going to go inside the apartment to talk. Upon arriving at the apartment door, a Defendant instructed Mr. Pajarito Saput to unlock the door. Mr. Pajarito Saput reasonably believed that he had no choice but to obey the Defendant's command, and opened the door to the apartment where Plaintiffs reside. At no point did Mr. Pajarito Saput or any other individual give consent for Defendants to enter the apartment. Once in the apartment, one Defendant stood near the apartment entrance.

28.     Mr. Tun-Cos and the Defendant who stayed behind while Mr. Tun-Cos parked his car made their way to the apartment where Plaintiffs reside. At this point, a Defendant showed Mr. Tun-Cos photos of two young men and asked if he knew them. Mr. Tun-Cos responded truthfully that he was familiar with the two men and that they used to live in the apartment, but that they had moved out about five years ago. Mr. Tun-Cos told the Defendant that the two men are brothers named Wilber and Carmelino Houx-Hernández (the "Houx-Hernández brothers"), and that Mr. Tun-Cos had kicked them out of the apartment long ago because of their drinking. The Defendant asked Mr. Tun-Cos if he knew the Houx-Hernández brothers' current contact information, and Mr. Tun-Cos responded truthfully that he did not. The same Defendant told Mr. Tun-Cos that the Houx-Hernández brothers were "in trouble with the police" but gave no further reasons why Defendants were looking for them.

29.     Neither of the Plaintiffs resemble either of the Houx-Hernández brothers (a fact to which Mr. Tun-Cos can attest, as he knew the Houx-Hernández brothers) other than that they all appear to be men of Latino race or ethnicity. Indeed, the Houx-Hernández brothers

are in their mid-20's. Mr. Tun-Cos is 42 years old, and Mr. Pajarito Saput is 49 years old. The other individual who exited Plaintiffs' apartment with Plaintiffs is approximately 47 years old. The individual who met them outside to carpool to work is approximately 36 years old.

30.     Despite the Plaintiffs' cooperation, and without any reasonable reason for doing so, Defendants arrested and frisked Plaintiffs and took them to an unmarked white van with ladders on top that was apparently designed to look like a construction or painter's van but is actually an ICE detainee transport van.

31.     The encounter in Plaintiffs' apartment lasted about thirty minutes. At no time were Plaintiffs informed of their legal rights.

32.     Plaintiffs were then taken in that van to an ICE facility in a warehouse park near Lorton, Virginia, where they were held for the entire day. In the early evening, Plaintiffs were driven to an ICE office in Fairfax, Virginia and released with instructions to return for periodic check-ins with ICE officials.

## LEGAL CLAIMS

### Count I: Unreasonable Seizure (Fourth Amendment *Bivens* Claim)

33.     Plaintiffs incorporate the allegations above as if fully made herein.

34.     The Trump Administration's guidance regarding priorities for deportation did not change the clearly-established requirements of the constitution: before ICE agents may initiate an investigative stop-and-questioning of an individual, the agents must *first* have a reasonable, articulable suspicion that an individual has violated the immigration laws of the United States.

35.     Defendants did not have a reasonable, articulable suspicion that Plaintiffs had violated any laws when, acting under color of law, they intentionally and willfully stopped Plaintiffs' vehicle on February 17, 2017—a stop which constituted a "seizure" under the Fourth

9

Amendment. Defendants' seizure of Plaintiffs without a reasonable, articulable suspicion of wrongdoing violated Plaintiffs' clearly-established right to be free from unlawful seizures. Defendants had no lawful reason to suspect that Plaintiffs might not have legal status.

36.     Even if Defendants were at Fairmont Gardens in a legitimate attempt to locate the Houx-Hernández brothers, Defendants had one or more photographs of the Houx-Hernández brothers and knew or should have immediately known that Plaintiffs do not resemble the Houx-Hernández brothers. Accordingly, any suspicion that Defendants may have had that Plaintiffs were in trouble with the law no longer existed after Defendants quickly determined that Plaintiffs were not the Houx-Hernández brothers. On information and belief, ICE's own training materials instruct ICE agents that a stop like the stop of Plaintiffs is unconstitutional.

37.     Even if Defendants had a reasonable, articulable suspicion that might have justified the initial stop of Plaintiffs' vehicle, the seizure was not sufficiently limited to the scope and duration that would have been adequate to confirm or dispel any possible reasonable suspicion that Plaintiffs were the Houx-Hernández brothers: Defendants physically blocked Plaintiffs' car, surrounded Plaintiffs, demanded identification, entered Plaintiffs' apartment without freely given consent or a warrant, and held them against their will for longer than necessary to establish that the Plaintiffs were not the men they were looking for.

38.     Defendants quickly realized that Plaintiffs were not the Houx-Hernández brothers but nevertheless continued to detain Plaintiffs against their will and questioned Plaintiffs in their vehicle and in their home without any reasonable suspicion of wrongdoing. Defendants profiled, detained, and questioned Plaintiffs solely based on Plaintiffs' apparent race, ethnicity, or perceived national origin.

39.     Defendants' violation of Plaintiffs' Fourth Amendment rights was willful, egregious, and done with deliberate indifference to Plaintiffs' clearly-established constitutional rights.

40.     As a result of Defendants' actions, Plaintiffs suffered harm, including but not limited to humiliation, emotional distress, loss of liberty, loss of income, and violations of their constitutional rights.

### Count II: Fifth Amendment Equal Protection *Bivens* Claim

41.     Plaintiffs incorporate the allegations above as if fully made herein.

42.     Defendants targeted, questioned, and seized Plaintiffs, doing so knowingly and intentionally, and motivated by Plaintiffs' race, ethnicity, and/or perceived national origin in violation of clearly established rights under the equal protection component of the Due Process Clause of the Fifth Amendment.

43.     As a result of Defendants' actions, Plaintiffs suffered harm, including but not limited to humiliation, emotional distress, loss of liberty, loss of income, and violations of their constitutional rights.

### Relief Requested

WHEREFORE, Plaintiffs request that the Court enter a judgment against Defendants and award the following:

A.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' seizure and questioning of Plaintiffs was a clear violation of Plaintiffs' Fourth and Fifth Amendment rights;

B.  Award Plaintiffs compensatory damages in an amount to be proven at trial;

C.  Hold Defendants jointly and severally liable for compensatory damages in an amount to be proven at trial;

11

D.  Award Plaintiffs punitive damages against each Defendant in an amount to be proven at trial;

E.  Award Plaintiffs the cost of this action and reasonable attorney fees; and

F.  Award such other relief as the court deems just and proper.

## Jury Demand

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.

Dated:  August 23, 2017                    Respectfully submitted,

**LEGAL AID JUSTICE CENTER**

By: _____
Simon Y. Sandoval-Moshenberg (VSB No. 77110)
Nicholas Marritz (VSB No. 89795)
6066 Leesburg Pike, Suite 520
Falls Church, VA  22041
(703) 720-5605
simon@justice4all.org
nicholas@justice4all.org

**COVINGTON & BURLING LLP**

Daniel E. Johnson (VSB No. 88696)
Mark H. Lynch (*pro hac application pending*)
José E. Arvelo (*pro hac application pending*)
Brandon H. Johnson (*pro hac application pending*)
Daniel T. Grant (*pro hac application pending*)
One CityCenter
850 Tenth Street, NW
Washington, DC  20001
(202) 662-5224
dejohnson@cov.com

*Counsel for Plaintiffs*