IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MYNOR ABDIEL TUN-COS, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 1:17-cv-943 |
| | ) | |
| B. PERROTTE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

DANA J. BOENTE
United States Attorney
Eastern District of Virginia

C. SALVATORE D'ALESSIO, Jr.
Acting Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel

DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

PAUL E. WERNER
Trial Attorney
Civil Division, Torts Branch
P.O. Box 7146 Ben Franklin Station
Washington, D.C. 20044

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 1

STANDARD OF REVIEW ........................................................................................ 2

ARGUMENT ............................................................................................................. 3

I. The INA Removes This Court's Jurisdiction Over Plaintiffs' Claims. ................... 3

   A.   Congress, through the INA, aimed to streamline the removal process and to
prevent piecemeal litigation. ........................................................................... 4

   B.   In 8 U.S.C. § 1252(b)(9), Congress streamlined the removal process, precluding the
review sought in this lawsuit. ........................................................................... 4

   C.   Section 1252(b)(9) bars Plaintiffs' claims, which have already been raised in removal
proceedings. ................................................................................................... 6

II. This Court Should Not Imply a Non-Statutory Remedy for Plaintiffs' Constitutional Claims. 8

   A.   Implying a damages remedy under the Constitution is disfavored. ................... 9

     i.   The "*ancien regime*" and *Abbasi*. ............................................................ 9

     ii.   The standard for implying a damages remedy. .......................................... 11

   B.   Plaintiffs ask this Court to extend *Bivens* into a new context. .......................... 13

   C.   The INA is a comprehensive statutory scheme that precludes Plaintiffs' claims. ............. 15

   D.   Other special factors counsel hesitation in this context. ................................... 16

     i.   The Constitution commits immigration matters to the political branches. ................... 17

     ii.   Congress's action in the field has been frequent and intense, yet Congress has never
provided a damages remedy. ....................................................................... 18

     iii.   Plaintiffs challenge Executive Branch policy and priorities. ......................... 19

     iv.   The system-wide costs of inferring a damages remedy counsel hesitation. .................. 20

     v.   Additional practical effects of allowing Plaintiffs' suit to proceed counsel against
implying a remedy. ...................................................................................... 22

III. Defendants Are Entitled to Qualified Immunity. ............................................... 23

   A.   Plaintiffs fail to allege that Defendants committed a clearly established Fourth
Amendment violation. ..................................................................................... 26

   B.   Plaintiffs have failed adequately to plead a violation of the Fifth Amendment. .............. 28

CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

Cases

*Adams v. Bain,*
    697 F.2d 1213 (4th Cir.1982) .................................................................................. 3

*Aguilar v. ICE,*
    510 F.3d 1 (1st Cir. 2007) ............................................................................... 4, 5, 6

*Aguilar v. ICE,*
    811 F. Supp. 2d 803 (S.D.N.Y. 2011) ....................................................................... 28

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) .................................................................................. 29

*Alvarez v. U.S. ICE,*
    818 F.3d 1194 (11th Cir. 2016) ................................................................................ 15

*Alvarez v. U.S. ICE,*
    137 S. Ct. 2321 (2017) ............................................................................................. 15

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ........................................................................................... 23, 24

*Arar v. Ashcroft,*
    585 F.3d 559 (2d Cir. 2009) ............................................................................... 15, 17

*Arias v. U.S. ICE Div. of the Dep't of Homeland Sec.,*
    No. 07-cv-1959, 2008 WL 1827604 (D. Minn. Apr. 23, 2008) ................................... 7

*Ashcroft v. al-Kidd,*
    563 U.S 731 (2011) .................................................................................................. 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................... passim

*Behrens v. Pelletier,*
    516 U.S. 299 (1996) ................................................................................................. 22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................... 23, 24

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
    403 U.S. 388 (1971) ..................................................................................... 2, 9, 11

*Bonhometre v. Gonzales,*
    414 F.3d 442 (3d Cir. 2005) ............................................................... 5

*Bush v. Lucas,*
    462 U.S. 367 (1983) .......................................................... 10, 11, 12

*Carlson v. Green,*
    446 U.S. 14 (1980) ....................................................................... 9, 11

*Chehazeh v. Att'y Gen.,*
    666 F.3d 118 (3d Cir. 2012) ............................................................... 6

*Cloaninger ex rel. Estate of Cloaninger v. McDevitt,*
    555 F.3d 324 (4th Cir. 2009) ........................................................... 23

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ................................................................... 10, 19

*Davis v. Passman,*
    442 U.S. 228 (1979) ..................................................................... 9, 11

*Davis v. United States,*
    No. 1:07-cr-254, 2011 WL 13192740 (E.D. Va. Dec. 12, 2011) ........... 26

*De La Paz v. Coy,*
    786 F.3d 367 (5th Cir. 2015) ......................................... 15, 17, 27

*De La Paz v. Coy,*
    137 S. Ct. 2289 (2017) ................................................................... 15

*Durham v. Horner,*
    690 F.3d 183 (4th Cir. 2012) ........................................................... 24

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ....................................................................... 10

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ....................................................................... 17

*Galvan v. Press,*
    347 U.S. 522 (1954) ....................................................................... 17

*Gibraltar, P.R., Inc. v. Otoki Grp., Inc.,*
    104 F.3d 616 (4th Cir. 1997) ........................................................... 29

*Harlow v. Fitzgerald*,

    457 U.S. 800 (1982) ............................................................ 23

*Hope v. Pelzer*,

    536 U.S. 730 (2002) ............................................................ 24

*Hunter v. Bryant*,

    502 U.S. 224 (1991) ............................................................ 23

*I.N.S. v. Lopez-Mendoza*,

    468 U.S. 1032 (1984) .................................................... 20, 21

*J.E. F.M. v. Lynch*,

    837 F.3d 1026 (9th Cir. 2016) ........................................... 5, 6

*Lebron v. Rumsfeld*,

    670 F.3d 540 (4th Cir. 2012) ......................................... 16, 17

*Madu v. U.S. Att'y Gen.*,

    470 F.3d 1362 (11th Cir. 2006) ............................................. 6

*Maldonado v. Holder*,

    763 F.3d 155 (2d Cir. 2014) ................................................ 19

*Malik v. Gonzales*,

    213 F. App'x 173 (4th Cir. 2007) .......................................... 7

*Minneci v. Pollard*,

    565 U.S. 118 (2012) ............................................................ 10

*Mirmehdi v. United States*,

    689 F.3d 975 (9th Cir. 2012) ................................... 15, 17, 18

*Mitchell v. Forsyth*,

    472 U.S. 511 (1985) ...................................................... 22, 23

*Ornelas v. United States*,

    517 U.S. 690 (1996) ............................................................ 25

*Rajah v. Mukasey*,

    544 F.3d 427 (2d Cir. 2008) ................................................ 21

*Raub v. Campbell*,

    785 F.3d 876 (4th Cir. 2015) .............................................. 24

*Reid v. Georgia*,

    448 U.S. 438 (1980) ............................................................................ 25

*Reno v. Am.-Arab Anti-Discrim. Comm.*,

    525 U.S. 471 (1999) ......................................................................... 5, 27

*Safar v. Tingle*,

    859 F.3d 241 (4th Cir. 2017) ............................................................. 25

*Schweiker v. Chilicky*,

    487 U.S. 412 (1988) .............................................................. 12, 17, 18

*Taft v. Vines*,

    70 F.3d 304 (4th Cir. 1995), *reh'g granted, opinion adopted in relevant part en banc*,

    83 F.3d 681, 683-84 (4th Cir. 1996) ................................................. 26

*U.S. ex rel. Osheroff v. Humana Inc.*,

    776 F.3d 805 (11th Cir. 2015) ........................................................... 16

*U.S. ex rel. Vuyyuru v. Jadhav*,

    555 F.3d 337 (4th Cir. 2009) ........................................................... 3, 7

*United States v. Alcaraz-Arellano*,

    441 F.3d 1252 (10th Cir. 2006) ......................................................... 20

*United States v. Armstrong*,

    517 U.S. 456 (1996) ....................................................................... 27, 28

*United States v. Braddock*,

    410 F. App'x 587 (4th Cir. 2011) ..................................................... 28

*United States v. Brignoni-Ponce*,

    422 U.S. 873 (1975) ........................................................................... 26

*United States v. Jones*,

    678 F.3d 293 (4th Cir. 2012) ............................................................. 25

*United States v. King*,

    119 F.3d 290 (4th Cir. 1997) ............................................................. 25

*United States v. Nicolas-Juan*,

    426 F. App'x 154 (4th Cir. 2011) ..................................................... 28

*United States v. Stanley*,

    483 U.S. 669 (1987) ............................................................... 12, 15

*Walters v. McMahon*,

    684 F.3d 435 (4th Cir. 2012) ..................................................... 24

*Wilkie v. Robbins*,

    551 U.S. 537 (2007) ........................................................ 10, 12, 20

*Yanez-Marquez v. Lynch*,

    789 F.3d 434 (4th Cir. 2015) ................................................. 6, 22

*Ziglar v. Abbasi*,

    137 S. Ct. 1843 (2017)................................................... passim

<u>Statutes</u>

U.S. Const. art. I, § 8, cl. 4............................................................ 16

U.S. Const. amend. IV .................................................................... 2

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ................ passim

8 U.S.C. § 1252(a) ......................................................................... 5

8 U.S.C. § 1252(b)(9) ............................................................... passim

28 U.S.C. § 2201....................................................................... 2, 29

28 U.S.C. § 2202............................................................................ 2

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,

    Pub. L. 104-208, 110 Stat. 3546 (1996) .................................... 4

REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302 (2005)................ 3

<u>Rules</u>

Federal Rule of Civil Procedure 12(b)(1) ................................... 2, 22

Federal Rule of Civil Procedure 12(b)(6) ............................... 2, 3, 22

<u>Other Authorities</u>

H.R. Conf. Rep. 109-72 (2005)...................................................... 4

## INTRODUCTION

This case is about a routine immigration enforcement operation that Plaintiffs are attempting to leverage to alter what they perceive to be certain aspects of the current administration's immigration policy. Their attempt comes through a personal liability lawsuit raising Fourth and Fifth Amendment claims directly against the line-level United States Immigration and Customs Enforcement (ICE) officers Plaintiffs claim conducted the operation.

Put simply, this individual-capacity lawsuit is not an appropriate avenue to remedy the constitutional challenges levied. Congress has removed this Court's jurisdiction over lawsuits such as this one, which, in addition to attempting to alter administration policy, threatens both to slow down the immigration removal process Congress has established, and to offer aliens in such proceedings two separate tracks to challenge immigration officials' actions rather than the single channel of review provided by statute. Congress clearly does not want either outcome. Moreover, the Supreme Court recently emphasized that personal-liability lawsuits are not the appropriate method for challenging an administration's policy. Additionally, numerous other special factors counsel hesitation in the immigration-enforcement context. Regardless, Defendants are entitled to qualified immunity because Plaintiffs have not alleged the violation of a clearly established constitutional right. In short, this Court should dismiss their suit.

## BACKGROUND[1]

According to Plaintiffs' complaint, at approximately 6:25 a.m. on February 17, 2017, Plaintiffs Mynor Tun-Cos and José Saput, along with two other individuals, left their apartment in Fairmont Oaks, an apartment complex in Annandale, VA, that has been the site of numerous

---

[1] For the purposes of this motion to dismiss only, the Court may assume the veracity of the well-pled factual allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

immigration enforcement operations over the last decade. *See* Compl. ¶¶ 18, 20. The apartment

Plaintiffs left had been occupied by two brothers—the Houx-Hernández brothers—who "were in

trouble with the police" and for whom ICE was searching. *Id.* ¶ 28. Plaintiffs entered their

vehicle, which was parked in the complex's parking lot, and began to pull out of their parking

space. *Id.* ¶¶ 20-21. An SUV then prevented Plaintiffs' vehicle from leaving the parking area,

and ICE officials, who got out of the SUV, asked Plaintiffs and the other occupants for

identification. *Id.* ¶ 21-22, 25. Plaintiffs provided some form of identification, but one of the

other occupants could not. *Id.* ¶ 25. Plaintiffs and Defendants then returned to Plaintiffs'

apartment, where Defendants showed Plaintiff Tun-Cos a photograph of the Houx-Hernández

brothers and asked him if he knew them. *Id.* ¶ 28. Tun-Cos admitted they had lived in his

apartment in the past, but stated they did not currently live there. *Id.* Defendants then arrested

Plaintiffs, transported them to an ICE facility, and released them towards the end of the day. *Id.*

¶¶ 30, 32. Plaintiffs allege that the Defendants targeted them solely because of their "apparent

race, ethnicity, or perceived national origin." *Id.* ¶ 38.

Based on these allegations, Plaintiffs bring two claims against Defendants under *Bivens v.*

*Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971): one for

alleged violation of their Fourth Amendment rights during the initial encounter and the later

questioning; and one for alleged violation of their Fifth Amendment equal protection rights. *Id.*

¶¶ 33-43. They seek damages and a declaratory judgment under 28 U.S.C. §§ 2201-02. *See*

Compl. at 11.

## STANDARD OF REVIEW

Defendants raise arguments under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6). When a defendant "challenges the existence of subject matter jurisdiction in fact, the

plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)). "Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute,' the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings . . . ." *Vuyyuru*, 555 F.3d at 348 (quoting *Adams*, 697 F.2d at 1219).

When considering a motion to dismiss under Rule 12(b)(6), the court ignores non-factual content, such as "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal citations and quotations omitted). The court then assumes the truth of well-pled factual allegations and determines whether those factual allegations plausibly state a claim upon which relief may be granted.

## ARGUMENT

This Court should dismiss Plaintiffs' claims for three independent reasons. First, the Immigration and Nationality Act (INA), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302 (2005), 8 U.S.C. §§ 1101 *et seq.*, removes this Court's jurisdiction over those claims and channels review through the immigration courts and the federal courts of appeals. Second, this Court should not imply the non-statutory remedy Plaintiffs seek where, as here, multiple special factors counsel hesitation in this new context. Third, Defendants are entitled to qualified immunity because Plaintiffs have failed adequately to allege the violation of any clearly established constitutional right.

## I.     The INA Removes This Court's Jurisdiction Over Plaintiffs' Claims.

Under § 242(b)(9) of the INA, 8 U.S.C. § 1252(b)(9), this Court lacks jurisdiction to consider Plaintiffs' claims, which must instead be raised either in immigration court or before the

Fourth Circuit in a petition for review. Congress, through the INA, intended to streamline the removal process and to prevent the sort of piecemeal litigation and parallel proceedings in which the Plaintiffs—who have raised their constitutional claims both in this suit and in their removal proceedings—are currently engaged. It enacted a specific provision to channel claims such as Plaintiffs' to the federal courts of appeals. Thus, this Court lacks jurisdiction here.

### A. Congress, through the INA, aimed to streamline the removal process and to prevent piecemeal litigation.

Congress has added and amended several sections of the INA over the past decades to streamline the removal process and to ensure that piecemeal litigation, which often arose in removal proceedings before those amendments, came to an end. For example, in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3546 (1996), which contained provisions reiterating that only courts of appeals, not district courts, could review final orders of removal, and that review of a final order of removal was the only method by which to review any issue raised in a removal proceeding. *See* H.R. Conf. Rep. 109-72, 173 (2005). Such provisions "were intended to preclude all district court review of any issue raised in a removal proceeding." *Id.* Congress again amended the INA in 2005 through the REAL ID Act, and again aimed to end the "piecemeal review, uncertainty, lack of uniformity, and . . . waste of resources both for the judicial branch and Government lawyers" that persisted through judicial review in both district courts and courts of appeals. *Id.* at 174. *See also Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (quoting H.R. Conf. Rep. 109-72).

### B. In 8 U.S.C. § 1252(b)(9), Congress streamlined the removal process, precluding the review sought in this lawsuit.

In 8 U.S.C. § 1252(b)(9), Congress provided that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions,

arising from any action taken or proceeding brought to remove an alien from the United States . .
. shall be available only in judicial review of a final order . . . ." Section 1252(b)(9) is an
"unmistakable 'zipper' clause." *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483
(1999) ("*AADC*"). Congress's purpose in enacting this clause "is evident." *Aguilar*, 510 F.3d at
9. It is meant "to consolidate and channel review of *all* legal and factual questions that arise from
the removal of an alien into the administrative process." *Id.*

Under that process, the sole avenue of judicial review is through the courts of appeals. As
§ 1252(a)(5) adds, "a petition for review filed with an appropriate court of appeals . . . shall be
the sole and exclusive means for judicial review of an order of removal . . . ." Combined with
§ 1252(a)(5), the zipper clause of § 1252(b)(9) means that "*any* issue—whether legal or
factual—arising from *any* removal-related activity can be reviewed *only*" through a petition for
review before a court of appeals. *J.E. F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). These
provisions "effectively limit all aliens to one bite of the apple with regard to challenging an order
of removal." *Bonhometre v. Gonzales*, 414 F.3d 442, 446 (3d Cir. 2005). *See also Aguilar*, 510
F.3d at 9 ("In enacting section 1252(b)(9), Congress plainly intended to put an end to the
scattershot and piecemeal nature of the review process that previously had held sway in regard to
removal proceedings." (citing H.R. Rep. No. 109-72)).

Section 1252(b)(9)'s "expanse is breathtaking." *Aguilar*, 510 F.3d at 9. As the First and
Ninth Circuits have held, it applies to all claims that arise from either an action or proceeding
brought in connection with the removal of an alien, except for claims that are "independent of, or
wholly collateral to, the removal process." *Id.* at 11. *See also J.E. F.M.*, 837 F.3d at 1032.
Although the precise contours of which claims are "independent" or "wholly collateral" is
unsettled, the case law makes clear that claims that commonly arise in the context of removal

proceedings fall within the ambit of § 1252(b)(9). *See Aguilar*, 510 F.3d at 13 ("The frequency with which right-to-counsel claims arise in removal proceedings refutes any notion that such claims are sufficiently separate from removal proceedings to be considered either 'independent' or 'collateral.'"); *J.E. F.M.*, 837 F.3d at 1033 (applying § 1252(b)(9) to right-of-counsel claims because they "are routinely raised in petitions for review filed with a federal court of appeals").[2]

Along those lines, aliens cannot "escape the vise-like grip of section 1252(b)(9)" by simply refusing to bring claims in immigration court and in petitions for review when those claims could have been brought. *Aguilar*, 510 F.3d at 9. Applying the statute otherwise would herald "an obvious loss of efficiency and bifurcation of review mechanisms," which "are among the principal evils that Congress sought to avoid through the passage of section 1252(b)(9)." *Id.* at 10. Nor does it matter that certain actions that are challenged occurred before removal proceedings began. As the *Aguilar* court explained, applying the statute only to claims that arise from ongoing removal proceedings "would put an undue premium on which party rushed to the courthouse first." *Id.* "More importantly," the First Circuit continued, "such a reading would render the word 'action' superfluous and effectively excise it from the statute." *Id.*

**C. Section 1252(b)(9) bars Plaintiffs' claims, which have already been raised in removal proceedings.**

As the above explanation of § 1252(b)(9) makes clear, that provision applies to Plaintiffs' claims under the Fourth and Fifth Amendments. Two reasons support this conclusion. First, Plaintiffs' claims for alleged violations of the Fourth Amendment and their equal protection rights are commonplace in removal proceedings. *See, e.g.*, *Yanez-Marquez v. Lynch*, 789 F.3d

---

[2] The Fourth Circuit has not addressed the scope of § 1252(b)(9). Two other circuits have interpreted § 1252(b)(9) more narrowly as applying only to review of a removal order. *See Chehazeh v. Att'y Gen.*, 666 F.3d 118, 131-33 (3d Cir. 2012); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006).

434, 445-51 (4th Cir. 2015) (discussing the standard for suppression of evidence in immigration

removal proceedings for Fourth Amendment violations); *Malik v. Gonzales*, 213 F. App'x 173,

174 (4th Cir. 2007) (considering equal protection claims in context of removal proceedings).

Therefore, those claims are not "independent" or "wholly collateral" from removal proceedings.

Indeed, a district court applied § 1252(b)(9) to bar claims markedly similar to those brought by

Plaintiffs. *See Arias v. U.S. ICE Div. of the Dep't of Homeland Sec.*, No. 07-cv-1959, 2008 WL

1827604 (D. Minn. Apr. 23, 2008). In *Arias*, aliens arrested during ICE operations brought

constitutional tort claims against ICE officials for, among other things, purported Fourth

Amendment and Fifth Amendment equal protection violations. The court dismissed the claims,

holding that § 1252(b)(9) stripped it of jurisdiction. *See id.* at *5-6.

Second, each Plaintiff has *already raised* the exact same Fourth Amendment claim—and

effectively has also raised the same Fifth Amendment claim—in the removal proceedings the

Government has instituted against him. *See* Ex. 1, Tun-Cos Mot. to Suppress Evid. & Term.

Procs., at 7-12; Ex. 2, Saput Mot. to Suppress Evid. & Term. Procs., at 7-12.[3] Those motions are

currently pending before the immigration court. Accordingly, an immigration judge is *already*

*considering* their Fourth Amendment, and, by dint of their allegations, their Fifth Amendment

claims.

This is precisely the sort of situation that Congress wanted to avoid through enacting

§ 1252(b)(9). By pursuing these parallel proceedings, Plaintiffs obtain for themselves "two bites"

of the proverbial apple—one before the immigration judge (and potentially later before the

Fourth Circuit in a petition for review), and another before this Court. Moreover, by asking two

---

[3] Courts may consider facts beyond the complaint to determine their jurisdiction. *See Vuyyuru*,
555 F.3d at 347 (citation omitted).

separate bodies to consider the same alleged facts, Plaintiffs consume scarce judicial and Executive Branch resources and create the very "piecemeal review, uncertainty, and lack of uniformity" that Congress sought to obviate through its amendments to the INA. It is not a stretch to imagine that two forums might reach different conclusions on nearly identical legal issues. Both proceedings could then be appealed to the same (or, depending on where suit was filed, potentially a different) court of appeals. Nor is it a stretch, given such a possible outcome, that one body would opt to stay its proceedings to allow the other to consider the issues Plaintiffs raise first. Such an outcome either would be the antithesis of the streamlined process for removal proceedings that Congress sought to construct through the jurisdiction-stripping provisions of the INA, including § 1252(b)(9), or would effectively deprive the Defendants of defenses to which they are entitled, as will be explained below. *See infra* Part II.D.v.

Because Plaintiffs' claims are commonplace in removal proceedings—and in fact have been raised there—§ 1252(b)(9) removes this Court's jurisdiction over those claims. Therefore, this Court must dismiss Plaintiffs' claims against the Defendants for lack of subject matter jurisdiction and allow the immigration court to address Plaintiffs' constitutional contentions.

## II. This Court Should Not Imply a Non-Statutory Remedy for Plaintiffs' Constitutional Claims.

Even without the jurisdictional bar of § 1252(b)(9), this Court should dismiss Plaintiffs' claims because under both recent Supreme Court precedent and Fourth Circuit precedent, they raise numerous special factors counselling hesitation which preclude any *Bivens* remedy. Plaintiffs ask this Court to infer a damages remedy in a new context the Supreme Court has never recognized. Additionally, Congress has already established—and frequently modified over the years—a comprehensive statutory scheme in this new context, a fact three other circuits have

noted, and this established process and congressional attention in this arena preclude supplementing the legislative scheme Congress has crafted. Moreover, implying a damages remedy in the immigration context, which is constitutionally committed to the political branches, raises a multitude of concerns regarding the administrability of such a remedy and its practical implications, concerns the Fourth Circuit has already recognized in another context in which it refused to imply a damages remedy.

### A. Implying a damages remedy under the Constitution is disfavored.

#### i. The "*ancien regime*" and *Abbasi*.

Plaintiffs ask this Court to create a damages remedy for them under *Bivens*, an action that "is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). In *Abbasi*, the Supreme Court explained that *Bivens*, which was decided over forty-five years ago, arose in a different legal "interpretive framework" under which courts "assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose." *Id.* at 1855 (internal quotations and citations omitted). Under this "*ancien regime*," the *Bivens* Court "held that courts must adjust their remedies so as to grant the necessary relief when federally protected rights have been invaded." *Id.* (internal quotations and citations omitted). *Bivens* itself provided a damages remedy under the Fourth Amendment for a United States citizen arrested without a warrant in his home in Brooklyn on drug charges. *See Bivens*, 403 U.S. at 389. In the decade after *Bivens*, and still under the then-prevailing legal framework, the Court expanded *Bivens* into only two new contexts: "a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Abbasi*, 137 S. Ct. at 1860 (reciting facts in *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980)).

But in the more than three decades since *Carlson*, the legal landscape has shifted away from implied causes of action, and the Court has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Abbasi*, 137 S. Ct. at 1857 (citing and quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). Indeed, in the nine cases that came before the Court in that time period—ten including *Abbasi*—the Court held that a *Bivens* remedy was not available. *See, e.g.*, *Abbasi*, 137 S. Ct. at 1863 (rejecting claims by post-September 11 detainees against Executive Branch officials); *Minneci v. Pollard*, 565 U.S. 118, 120 (2012) (rejecting claims by federal prisoner against guards at private prison); *Wilkie v. Robbins*, 551 U.S. 537, 547-48 (2007) (rejecting claims against Bureau of Land Management officials for allegedly pushing "too hard" in the execution of their duties); *Malesko*, 534 U.S. at 63 (rejecting claim against private prison operator); *FDIC v. Meyer*, 510 U.S. 471, 473-74 (1994) (rejecting claim against federal agency). The Court itself has gone so far as to note that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1856. Although the Court has not abrogated *Bivens*, it has emphasized—repeatedly—that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (quoting *Iqbal*, 556 U.S. at 675).

Accordingly, the Court explained that when a party "seeks to assert an implied cause of action under the Constitution . . . separation-of-powers principles are or should be central to the analysis." *Abbasi*, 137 S. Ct. at 1857. "The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). And because "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex

sphere of litigation, with all of its burdens on some and benefits to others," *Abbasi*, 137 S. Ct. at 1858, the Court offered this answer: "most often it will be Congress." *Id.* at 1857. That is because when an issue "involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* (quoting *Bush*, 462 U.S. at 380) (internal quotations omitted).

ii.     **The standard for implying a damages remedy.**

*Abbasi* also clarified the standard for evaluating whether to imply a damages remedy under *Bivens*. First, a court must determine whether recognizing a remedy would extend *Bivens* into a new context. The Court defined "new context" as an instance where "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id.* at 1859. In other words, if the case is different "in a meaningful way" from either Fourth Amendment claims against federal law enforcement officers for a domestic search and seizure of a United States citizen on suspected drug offenses, *see Bivens*, 403 U.S. at 389; Fifth Amendment claims for the firing of a female congressional secretary based on her gender, *see Davis*, 442 U.S. at 230; or Eighth Amendment claims against prison officials for failing to treat an inmate's asthma, causing him death, *see Carlson*, 446 U.S. at 19, then the context is new.

The Court then offered a non-exhaustive list of examples that could "prove instructive" in determining whether differences are meaningful. *Abbasi*, 137 S. Ct. at 1860. That list included, among others, the following three examples: (1) "the statutory or other legal mandate under which the officer was operating"; (2) "the risk of disruptive intrusion by the Judiciary into the functioning of other branches"; and (3) "the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* Each of these examples alone could render the context new.

*Id.* Moreover, seemingly minor differences, if meaningful, can present a new context. As the Court in *Abbasi* noted, "even a modest extension is still an extension." *Id.* at 1864.

If a plaintiff seeks to extend *Bivens* into a new context, then the court *must* address whether special factors counsel hesitation. *See id.* at 1860. To answer this question, the Supreme Court has engaged in a two-step inquiry identified in *Wilkie*. The court first asks whether Congress has instituted "any alternative, existing process for protecting" a plaintiff's interests, 551 U.S. at 537, or any "meaningful safeguards or remedies" for the plaintiff. *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988). Such actions by Congress imply that it "expected the Judiciary to stay its *Bivens* hand" and not infer a new damages remedy. *Wilkie*, 551 U.S. at 554; *see, e.g.*, *Abbasi*, 137 S. Ct. at 1863 ("And when alternative methods of relief are available, a *Bivens* remedy usually is not."); *Chilicky*, 487 U.S. at 429; *Bush*, 462 U.S. at 390. That Congress's scheme may not provide the precise remedy a plaintiff seeks, such as damages, does not alter this analysis. *See United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [defendants] an 'adequate' federal remedy for his injuries.").

Second, even if no alternative process exists, the court considers whether there are any additional "special factors counselling hesitation." *Wilkie*, 551 U.S. at 550. Although the Court "has not defined" that phrase, the "necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. The threshold for being a special factor is quite low. Indeed, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* The *Abbasi* Court did not provide an exhaustive list of special factors

counselling hesitation, but it did provide several examples, including a lawsuit in which a plaintiff effectively challenges a broad government policy. *See Abbasi*, 137 S. Ct. at 1860 ("[I]t must be noted that a *Bivens* action is not a proper vehicle for altering an entity's policy." (internal citation and quotation omitted)).

Here, Plaintiffs undoubtedly ask this Court to extend *Bivens* into a new context. This new context is one in which Congress has extensively and repeatedly legislated, providing a comprehensive process to address contentions of wrongful conduct, including constitutional violations, during immigration enforcement. Plaintiffs' complaint also raises numerous special factors counselling hesitation, not the least of which is their attempt to challenge a purported immigration enforcement policy. This Court should therefore dismiss Plaintiffs' complaint and allow the immigration court to continue addressing their constitutional claims.

### B.   Plaintiffs ask this Court to extend *Bivens* into a new context.

Plaintiffs' claims fall within the three examples of meaningful differences mentioned in the previous section, and clearly seek to extend *Bivens* into a context the Supreme Court has never considered. First, the Defendants in this case were operating under a different "statutory or other legal mandate," *Abbasi*, 137 S. Ct. at 1860, than the officials in *Bivens*, *Davis*, or *Carlson*. Specifically, all Defendants are ICE officials who were conducting immigration enforcement operations under the statutory mandate of the INA. They are tasked with identifying, locating, and removing aliens unlawfully present in this country, irrespective of whichever administration they serve. In contrast, the traditional law enforcement officials in *Bivens*, the federal workplace supervisor in *Davis*, and the prison officials in *Carlson* all operated under entirely different legal frameworks. Indeed, the Supreme Court has never permitted a claim to proceed in the context of immigration enforcement.

Second, Plaintiffs' claims risk the "disruptive intrusion by the Judiciary into the functioning of other branches," *Abbasi*, 137 S. Ct. at 1860, in a way that was not present in *Bivens* or its progeny. As already detailed in Part I, Plaintiffs' claims risk disrupting the streamlined removal process Congress has enacted and thereby potentially obtaining two separate rulings from two adjudicatory bodies on the same issue, or staying those proceedings so as to avoid such a possibility, and thereby delaying the removal process. Such an outcome stymies both the Legislative Branch's deliberate design of a streamlined process and the Executive Branch's immigration policy. It also undermines the primacy of those branches in this area. No such risks were present in *Bivens* or its progeny.

Third, this case presents "potential special factors that previous *Bivens* cases did not consider." *Abbasi*, 137 S. Ct. at 1860. In addition to the concerns of delay in immigration proceedings already mentioned, and as explained more fully below, *see infra* Part II.D.v., those claims have the potential of exposing personal-liability defendants to cross-examination in evidentiary hearings in those proceedings without personal representation, thereby effectively abrogating any qualified immunity defenses those defendants may have. Moreover, if the Government were to move to stay such proceedings until the resolution of any *Bivens* claims—a process that can take years—that would substantially increase the incentive for an alien to file just such a suit in the hopes of delaying his or her removal, thereby opening the floodgates of litigation against line-level ICE officers. This is turn risks chilling immigration enforcement. No comparable considerations arose in the contexts in which the Supreme Court implied a damages remedy.

Any one of the above differences alone would be "meaningful" enough to establish this as a new context. *See Abbasi*, 137 S. Ct. at 1860. Together, they undoubtedly do. All the more so

given that "the new-context inquiry is easily satisfied." *Id.* at 1865. Because Plaintiffs' claims arise in a new context, this Court must determine whether any special factors are present.

**C.  The INA is a comprehensive statutory scheme that precludes Plaintiffs' claims.**

As at least three circuits—the Fifth, Ninth, and Eleventh—have all held, the INA is a comprehensive scheme that precludes a court from implying a damages remedy in the immigration enforcement context. *See Alvarez v. U.S. ICE*, 818 F.3d 1194, 1208-10 (11th Cir. 2016); *De La Paz v. Coy*, 786 F.3d 367, 375-78 (5th Cir. 2015); *Mirmehdi v. United States*, 689 F.3d 975, 982-83 (9th Cir. 2012). *Cf. Arar v. Ashcroft*, 585 F.3d 559, 573 (2d Cir. 2009) (noting that given "the complexity of the remedial scheme Congress has created (and frequently amended), we would ordinarily draw a strong inference that Congress intended the judiciary to stay its hand and refrain from creating a *Bivens* action in this context" but not deciding that question in light of the case's unique circumstances and other special factors present). In two of those cases—*Alvarez* and *De La Paz*—the Supreme Court denied certiorari a week after deciding *Abbasi. See Alvarez*, 137 S. Ct. 2321 (2017); *De La Paz*, 137 S. Ct. 2289 (2017).

The Fifth Circuit's decision in *De La Paz* amply explains why refusing to imply a remedy in the immigration context makes sense. There, the court first walked through the numerous safeguards the INA provides to individuals in removal proceedings, noting that the INA provides aliens with notice of proceedings, an adversarial removal hearing, the right to counsel at the hearing, the right to present and examine evidence, an appeals process to both the Board of Immigration Appeals and a federal court of appeals, and standards under which law enforcement personnel must operate and conduct themselves. *See De La Paz*, 786 F.3d at 375-76 (citing various provisions of the INA); *see also Alvarez*, 818 F.3d at 1208 (similarly explaining the various procedural safeguards the INA provides aliens). These provisions provide ample

safeguards to the rights Plaintiffs claim were violated. In fact, under the above scheme, Plaintiffs have already sought redress for the alleged violation of those very rights. *See* Exs. 1, 2.[4] That the INA does not provide the specific remedy that Plaintiffs seek—money damages—does not mean this Court should imply one. *See Stanley*, 483 U.S. at 683 ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [defendants] an 'adequate' federal remedy for his injuries."). *See also infra*, Part II.D.ii. In sum, the INA is an elaborate, carefully constructed remedial scheme that provides adequate protections and safeguards to aliens. Under the first step of the two-step inquiry laid out by the Supreme Court, and under substantial circuit court precedent, this Court should dismiss Plaintiffs' claims.

### D. Other special factors counsel hesitation in this context.

The above conclusion is all the more sound when one considers the separation-of-powers concerns and the "problems of administrability" implicated by inferring a damages remedy here. *Lebron v. Rumsfeld*, 670 F.3d 540, 553 (4th Cir. 2012). The Fourth Circuit has recognized that such concerns and problems are highly relevant when determining whether to imply a remedy under *Bivens*. In *Lebron*, the court dismissed on special factors grounds the *Bivens* claims of a United States citizen detained domestically as a suspected terrorist, noting those claims involved an area which the Constitution committed to Congress and the Executive, and that numerous administrability concerns and undesirable practical effects would flow from inferring a remedy for the plaintiff. *See id.* at 548-49, 553-54 (discussing the constitutional commitment of national security and military affairs to the political branches, and the practical effects a damages remedy would have on national security policymaking, ongoing intelligence operations, and the

---

[4] "Courts may take judicial notice of publicly filed documents" in considering a Rule 12(b)(6) motion. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).

command structure of the military). Although the context of Plaintiffs' claims is different from that in *Lebron*, the overarching concerns regarding the separation of powers and administrability mentioned above—which the Fourth Circuit discussed at length—are clearly present.

      **i.    The Constitution commits immigration matters to the political branches.**

First and foremost, Plaintiffs' claims raise separation-of-powers concerns. Congress has plenary control over immigration matters. *See* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization . . . ."); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (internal citations and quotation marks omitted)); *Galvan v. Press,* 347 U.S. 522, 531 (1954) (the principle that "the formulation of these policies [concerning the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government").

Moreover, "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation.'" *Mirmehdi*, 689 F.3d at 982 (quoting *Arar*, 585 F.3d at 574). Those matters, in turn, are constitutionally committed to Congress and the Executive. *See Lebron*, 670 F.3d at 548-49. As the Fourth Circuit in *Lebron* recognized, 670 F.3d at 548, and as the Supreme Court in *Abbasi* confirmed, "separation-of-powers principles are or should be central to the analysis" of whether to recognize a damages remedy. *Abbasi*, 137 S. Ct. at 1857. Here, this factor squarely counsels against creating a *Bivens* remedy.

### ii. Congress's action in the field has been frequent and intense, yet Congress has never provided a damages remedy.

Congress has exercised its plenary control over immigration by enacting and repeatedly modifying the INA. Yet it has never created a damages remedy for an alien within that scheme. This does not mean courts should supplement Congress's judgment. Quite the opposite. Given Congress's "repeated and careful attention to immigration matters," *De La Paz*, 786 F.3d at 377, its omission of that remedy from the INA cannot be said to have "been inadvertent." *Id.* (quoting *Schweiker*, 487 U.S. at 423). Indeed, since enacting the INA in 1952, Congress has amended it at least six times. *De La Paz*, 786 F.3d at 377 (listing statutes). Despite those repeated amendments, Congress has never provided a damages remedy.

This "institutional silence speaks volumes." *Id.* It also "counsels strongly against judicial usurpation of the legislative function." *Id. See also Abbasi*, 137 S. Ct. at 1862 (noting that where policies "attract the attention of Congress," yet "Congress fails to provide a damages remedy," then "it is much more difficult to believe that 'congressional inaction' was 'inadvertant'" (citing *Schweiker*, 487 U.S. at 423)). *Mirmehdi*, 689 F.3d at 982 ("Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the Immigration and Nationality Act, Congress never created such a remedy." (citation omitted)). Thus, not only do claims in this arena "have the natural tendency" to affect other areas constitutionally committed to the political branches, but Congress, despite its frequent attention to immigration in general and the INA in particular, has never provided a damages remedy. Under these circumstances, this Court should not supplant the legislative function. It should dismiss Plaintiffs' complaint.

### iii. Plaintiffs challenge Executive Branch policy and priorities.

Furthermore, Plaintiffs' complaint against "collateral arrests," and its implicit call for a different immigration enforcement system, challenge a purported policy of the current administration. Plaintiffs make little, if any, attempt to obscure this. Indeed, in raising their concerns about the purported existence of such arrests, they cite "President Trump's January 25, 2017 Executive Order, Enhancing Public Safety in the Interior of the United States," which, according to Plaintiffs, was an effort by the current administration to "'take the shackles off' ICE agents in their enforcement activities," Compl. ¶ 5 (quoting statement of White House Press Secretary), as a cause for their arrests. This is not the only example in Plaintiffs' complaint of references to proclamations or perceived policies promulgated by high-level Executive Branch officials as support for their claims against the Defendants. *See id.* ¶ 15 (comparing "the Obama Administration's immigration enforcement policies and practices" with the "January 25, 2017 Executive Order and implementing guidance from DHS"); *id.* (quoting statements of White House Press Secretary regarding "Trump Administration's efforts" in the immigration enforcement arena); *id.* (comparing memorandum issued by Obama-appointed Secretary of Homeland Security with memorandum issued by Trump-appointed Secretary of Homeland Security). Thus, in effect, Plaintiffs bring this personal-liability lawsuit against five line-level agents based on purported immigration policies adopted by the current administration.

But as the *Abbasi* Court emphasized, "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 72). Moreover, as the Court explained, even if a complaint "is confined to the conduct of a particular Executive Officer in a discrete instance," the claims nonetheless may "call into question the formulation and implementation of a general policy." *Id.* That is distinctly possible here. As the Court concluded,

"[w]ere this inquiry to be allowed in a private suit for damages, the *Bivens* action would assume dimensions far greater than those present in *Bivens* itself, or in either of its two follow-on cases." *Id.* at 1861. This is yet another special factor counselling against implying a remedy here.

Furthermore, Plaintiffs' complaint against "collateral arrests," Compl. ¶¶ 5-6, 17, 19, implicitly calls for this Court to endorse an immigration enforcement regime under which ICE officials apprehend only the specific, already known targets of any operations. *Cf. id.* ¶ 18 (alleging that under Obama Administration, ICE agents "generally arrested only those persons whom they had come to arrest"). Such a regime would "render egregious (and therefore forbidden) ICE raids on sweatshops, forced brothels, and other settings in which illegal aliens are exploited and threatened—and much worse." *Maldonado v. Holder*, 763 F.3d 155, 162 (2d Cir. 2014). As the Second Court aptly concluded, "[n]o system of immigration enforcement can run under these constraints." *Id.* at 163.

### iv.   The system-wide costs of inferring a damages remedy counsel hesitation.

Beyond the separation-of-powers concerns discussed above, multiple "problems of administrability" would flow from creating a damages remedy in this context. At the outset, and as detailed above, inferring a remedy in this context would slow down the streamlined removal process that Congress has established. The Supreme Court has long recognized the costs of disrupting removal proceedings with various constitutional challenges. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1048 (1984) ("The INS currently operates a deliberately simple deportation hearing system, streamlined to permit the quick resolution of very large numbers of deportation actions, and it is against this backdrop that the costs of the exclusionary rule must be assessed."). As the *Lopez-Mendoza* Court explained in holding that, generally, the exclusionary rule does not apply in civil removal proceedings, "[t]he prospect of even occasional invocation

of the exclusionary rule might significantly change and complicate the character of these proceedings." *Id.* Allowing Plaintiffs' claims to proceed under *Bivens* raises similar concerns.

Additionally, in the context of immigration enforcement operations, claims similar to Plaintiffs' could readily be asserted by other aliens facing removal proceedings. Moreover, such claims—particularly to the extent they turn on ICE officials' motives—are relatively easy to plead and can be difficult to disprove. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[C]harges of racial discrimination . . . may be easy to make and difficult to disprove." (citation omitted)). This could open the floodgates of litigation against ICE officials enforcing immigration laws. *Cf. Wilkie*, 551 U.S. at 561 (dismissing claims on special factors grounds in part because "a *Bivens* action to redress retaliation against those who resist Government impositions on their property rights would invite claims in every sphere of legitimate governmental action affecting property interests").

The outcome of this would be a marked increase in the number of personal-liability lawsuits filed against line-level ICE officials based on the circumstances surrounding arrests, the adequate defense of which "would impose an intolerable administrative burden on the immigration enforcement system." *Rajah v. Mukasey*, 544 F.3d 427, 447 (2d Cir. 2008) (discussing *Lopez-Mendoza*). As the Second Circuit noted in *Rajah*, "officers may arrest several aliens per day" and therefore "cannot be expected to compile elaborate, contemporaneous, written reports detailing the circumstances of every arrest." *Id. See also Lopez-Mendoza*, 468 U.S. at 1049-50 ("The demand for a precise account of exactly what happened in each particular arrest would plainly preclude mass arrests, even when the [agency] is confronted, as it often is, with massed numbers of ascertainably illegal aliens, and even when the arrests can be and are conducted in full compliance with all Fourth Amendment requirements."). Yet to defend the sort

of lawsuit Plaintiffs bring here—should it proceed beyond the pleadings stage—may require precisely that sort of detail, short of a trial by jury solely to evaluate the credibility of an alien who, for example, claims he did not give voluntary consent against the testimony of ICE officials who claim he did. The balancing of such concerns, and the related decision of whether to permit this class of cases, belong to Congress, not the courts. *See Abbasi*, 137 S. Ct. at 1858.

> **v.    Additional practical effects of allowing Plaintiffs' suit to proceed counsel against implying a remedy.**

Lastly, at least one concrete, practical effect of allowing suits such as Plaintiffs' to proceed strongly counsels against implying a damages remedy. Such suits may force the Government to decide between on the one hand pursuing immigration removal proceedings against unlawfully present aliens, or on the other, forcing line-level ICE officials who face potential personal liability to effectively forego their entitlement to a qualified immunity defense by subjecting them to cross-examination in an evidentiary hearing.

That is precisely the quandary the Government (and the Defendants) face in this very case. As mentioned above, Plaintiffs have already raised constitutional claims nearly identical to those here in their removal proceedings in motions to suppress evidence. Under Fourth Circuit precedent, if an alien pleads an "egregious" Fourth Amendment violation, he or she can obtain an evidentiary hearing. *See Yanez-Marquez*, 789 F.3d at 450-51. Should Plaintiffs establish a *prima facie* case through their motions, Defendants would potentially face an evidentiary hearing at which they could be cross-examined by Plaintiffs' counsel—who also represents them in their removal proceedings, *see* Exs. 1, 2—about the very events underlying Plaintiffs' complaint. And Defendants would face that cross-examination without their personal attorney, who is focused on their personal interests, to defend them.

Beyond the inherent injustice in such a scenario, it would enable Plaintiffs to circumvent Defendants' qualified immunity defense, which the Supreme Court has long held is meant to protect federal officials from the burdens of litigation, including discovery, in the absence of a clearly established constitutional violation. *See, e.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) ("*Harlow* and *Mitchell* make clear that the [qualified immunity] defense is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery' . . . ."); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of a violation of clearly established law, the defendant is entitled to qualified immunity before the commencement of discovery."); *see also Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 330 (4th Cir. 2009) (quoting *Mitchell*, 472 U.S. at 526). Not only would this give Plaintiffs two bites of the apple in their removal proceedings, it would give them two bites of the apple in their discovery into Defendants: one during immigration removal proceedings, and one during civil discovery. That simply cannot be right. And it certainly is not what *Bivens* was meant for.

In short, Plaintiffs' claims raise numerous separation-of-powers and system-wide administrability concerns, among other special factors. They also raise the prospect of Plaintiffs using this lawsuit as both a shield, potentially delaying their immigration removal proceedings, and as a sword, obtaining premature discovery against Defendants in this case. This Court should not permit that, and should instead dismiss Plaintiffs' claims.

## III.    Defendants Are Entitled to Qualified Immunity.

Dismissal of Plaintiffs' *Bivens* claims is also warranted on the independent ground that Defendants are entitled to qualified immunity. The courts have long noted that individual-capacity actions like this one "entail substantial social costs, including the risk that fear of

personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citation omitted). To address those concerns, the Supreme Court established the defense of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Qualified immunity shields officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. The Supreme Court has emphasized that in order to ensure that qualified immunity shields officials from the fear of civil damages as well as the harassment of litigation, *Anderson*, 483 U.S. at 638, qualified immunity contains an "entitlement not to stand trial or face the other burdens of litigation." *Mitchell*, 472 U.S. at 526 (citation omitted). It is "an *immunity from suit* rather than a mere defense to liability." *Id.* Accordingly, the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (citations omitted).

Two components of qualified immunity come into play in this case: first, for Plaintiffs' constitutional claims to survive, they must allege facts "plausibly suggesting (not merely consistent with)" violation of a clearly established right. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). In evaluating the allegations, the Court must ignore "legal conclusions" stated in the complaint. *Walters v. McMahon*, 684 F.3d 435, 439 (4th Cir. 2012). After eliminating such unsupported legal conclusions, the Court should ask whether Plaintiff has proffered sufficient "factual allegations" against each Defendant to "advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation

omitted). Although the "plausibility standard is not akin to a 'probability requirement,'" *id.*, an inference of misconduct may be rendered implausible when the allegations of misconduct are more likely explained by lawful behavior than by unlawful behavior. *See id.* at 679-80.

Moreover, qualified immunity is a "fair notice" requirement, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), which is intended to protect government officials from suit unless they are "plainly incompetent or . . . knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S 731, 743 (2011) (quotation omitted); *see also Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (granting qualified immunity in the § 1983 context). Qualified immunity "gives ample room for mistaken judgments" and "protects public officials from bad guesses in gray areas." *Durham v. Horner*, 690 F.3d 183, 190 (4th Cir. 2012) (internal quotations and citations omitted). For a right to be clearly established, it must be adequately developed by existing law so as to provide an official with sufficient guidance: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The illegality of the officer's actions must, in the light of pre-existing law, be "beyond debate." *al-Kidd*, 563 U.S. at 741. Lastly, the Supreme Court has "repeatedly" implored lower courts "not to define clearly established law at a high level of generality." *Id.* at 742 (citations omitted). *See also Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017) ("[I]t is a longstanding principle that clearly established law should not be defined at a high level of generality." (internal quotation and citation omitted)). This Court should grant qualified immunity to Defendants because Plaintiffs have failed plausibly to allege that Defendants violated a clearly established constitutional right.

### A. Plaintiffs fail to allege that Defendants committed a clearly established Fourth Amendment violation.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Law enforcement officers are permitted to conduct an investigatory stop if they have a "reasonable and articulable suspicion that the person seized is engaged in criminal activity." *See United States v. King*, 119 F.3d 290, 294 (4th Cir. 1997) (quoting *Reid v. Georgia*, 448 U.S. 438, 400 (1980)). "A reasonable, articulable suspicion is a particularized and objective basis for suspecting the person stopped." *King*, 119 F.3d at 294 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Assuming that Plaintiffs' factual allegations are correct for the purposes of this dispositive motion only, Defendants concede that Plaintiffs have pled that an investigatory stop occurred when Plaintiffs' vehicle was blocked by an SUV in the early morning hours of February 17. *See* Compl. ¶ 21; *United States v. Jones*, 678 F.3d 293, 300-01 (4th Cir. 2012).

But it certainly was not clearly established that the stop was unreasonable or that Defendants had no "particularized and objective basis for suspecting" the occupants of the vehicle and stopping it. According to Plaintiffs' own complaint, Defendants were searching for male suspects who had lived in the apartment complex at which the stop occurred. *See* Compl. ¶ 28. Not only that, the suspected criminals had lived in the very apartment Plaintiffs left as they went to their vehicle early that morning. *Id.* Moreover, the stop occurred at 6:25 a.m., *id.* ¶ 20, roughly thirty minutes before sunrise, in the heart of winter.[5]

Under such circumstances, Defendants had a "particularized and objective basis" to stop Plaintiffs' vehicle to ascertain whether any of the four male occupants in fact were the male

---

[5] Courts may take judicial notice of such undisputed facts as the time of sunrise on a certain date. *See Davis v. United States*, No. 1:07-cr-254, 2011 WL 13192740, at *3 (E.D. Va. Dec. 12, 2011). According to the Old Farmer's Almanac, on February 17, 2017, sunrise in Annandale, VA, was at 6:55 a.m. *See* https://www.almanac.com/astronomy/rise/VA/Annandale/2017-02-17.

criminal suspects Defendants sought. *See Taft v. Vines*, 70 F.3d 304, 312 (4th Cir. 1995) (officers had reasonable suspicion to stop vehicle that left mobile home park where suspected murderer resided), *reh'g granted, opinion adopted in relevant part en banc*, 83 F.3d 681, 683-84 (4th Cir. 1996) (per curiam). At bare minimum, it was not clearly established they had no lawful basis for stopping the vehicle. That none of the occupants turned out to be the suspected criminals is irrelevant. *Id.* ("[T]he mistaken seizure of an individual is not pertinent to a proper qualified immunity analysis.").

Once the Defendants had a basis for stopping the vehicle on suspicion of containing criminal aliens, they were entitled to ask the occupants for their identification and their immigration status. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) ("[W]hen an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion."). As the Court added in *Brignoni-Ponce*, "[t]he officer may question the driver and passengers about their citizenship and immigration status . . . ." *Id.* That one of the vehicle occupants could not produce identification, Compl. ¶ 25, would not serve to allay any suspicion Defendants had. Moreover, Plaintiffs make no mention of what sort of identification they produced—or of their actual citizenship and status to be in the United States, for that matter. *See generally* Compl. Such "evasive pleading," *De La Paz*, 786 F.3d at 370 n.2, cannot skirt the fact that Plaintiffs themselves, in their own motions to suppress filed in their removal proceedings, do not contest that they indeed are aliens who do not have legal status to remain in the United States. *See generally* Exs. 1, 2. Once this fact was established, be it at the vehicle when officers first asked for identification, or in the apartment they returned to after an occupant failed to produce identification, any possible Fourth Amendment concerns disappeared.

In sum, Plaintiffs have failed to allege that Defendants violated a clearly established Fourth Amendment right. This Court should therefore dismiss Plaintiffs' Fourth Amendment claim because Defendants are entitled to qualified immunity.

**B. Plaintiffs have failed adequately to plead a violation of the Fifth Amendment.**

Similarly, this Court should dismiss Plaintiffs' equal protection claim because they have failed to allege a plausible violation of their Fifth Amendment rights, not to mention a clearly established violation. In effect, their equal protection claim is a selective prosecution claim in that they assert the Government has selected to enforce immigration laws against them based on their race and ethnicity, while not doing so to unlawfully present aliens of other races and ethnicities. "As a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *AADC*, 525 U.S. at 488. Thus, it is not clearly impermissible for the United States to take into account an alien's national origin in removal proceedings. Although in the criminal context, a decision to prosecute aliens of a certain race and ethnicity in a discriminatory manner or based on a discriminatory animus would likely be unlawful, *see United States v. Armstrong*, 517 U.S. 456, 464 (1996), even in that context, to state such a claim, a plaintiff "must establish that (1) similarly situated individuals of a different race were not prosecuted; and (2) that the decision to prosecute was invidious or in bad faith." *United States v. Braddock*, 410 F. App'x 587, 589 (4th Cir. 2011) (per curiam) (internal quotation marks and citations omitted). *See also United States v. Nicolas-Juan*, 426 F. App'x 154, 155 (4th Cir. 2011) (per curiam) (dismissing equal protection claim because criminal alien was "not similarly situated with non-criminal aliens").

Plaintiffs—who face immigration removal proceedings, which are civil, and not criminal proceedings—fail plausibly to allege either of the criteria they would need to plead even if

prosecuted. First, they have not alleged that other similarly situated aliens of a different race or ethnicity were not questioned or detained. Their assertions that "ICE targeted Fairmont Gardens residents for enforcement at a frequency well beyond that of any similarly-sized apartment complex" in the area, Compl. ¶ 19, is irrelevant because the correct inquiry focuses on similarly situated aliens, not similarly situated apartment complexes regardless of their occupants. *See Armstrong*, 517 U.S. at 464. And Plaintiffs simply have not alleged that similarly situated unlawful aliens located in Fairmont Gardens—or anywhere else in Annandale—who are not of Latino ethnicity have been treated differently than Plaintiffs. *See generally*, Compl.

Even if Plaintiffs had adequately alleged that they were treated differently than similarly situated unlawful aliens, their allegations of discriminatory intent are wholly conclusory. Their claim that Defendants detained them "because Plaintiffs appeared to be of Latino race or ethnicity and because of their perceived origin," *id.* ¶ 3, is just the sort of "formulaic recitation of the elements of a cause of action" that this Court must ignore. *Iqbal*, 556 U.S. at 662. *See Aguilar v. ICE*, 811 F. Supp. 2d 803, 820 (S.D.N.Y. 2011) (dismissing equal protection claim where plaintiffs alleged that officials "intended to violate constitutional rights").

Moreover, their claims simply are implausible. Although Plaintiffs couch their claims in the context of the current administration's purported increase in removal actions against unlawfully present aliens, *see* Compl. ¶¶ 5-6, 16, none of the administration statements or orders cited specifically targeted Latinos or singled them out for removal. *See id.* Nor do Plaintiffs allege that the purported increase in immigration enforcement has disproportionately affected Latinos. Regardless, Defendants cannot be held liable for the actions of their superiors, and no factually pled discriminatory animus has been attributed to Defendants. *See Iqbal*, 556 U.S. at 676. Most importantly, however, Plaintiffs' bare assertion that Defendants detained and

questioned them "solely based on Plaintiffs' apparent race, ethnicity, or perceived national origin," Compl. ¶ 38, is belied by a more plausible explanation. Namely, Defendants detained and questioned Plaintiffs because in the early morning hours, they left the apartment where suspected criminal aliens Defendants were searching for had lived. *Id.* ¶ 28. And, as it turned out, Plaintiffs were undocumented aliens and could not establish lawful presence. As between the "obvious alternative explanation" for the detention and questioning of Plaintiffs and "the purposeful, invidious discrimination" Plaintiffs asks this Court to infer, "discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682.[6]

## CONCLUSION

Plaintiffs' suit attempts to stymie their immigration removal proceedings and to alter perceived immigration enforcement policy. Congress and the Supreme Court have both weighed in against such attempts. For these reasons and those stated above, this Court should dismiss Plaintiffs' complaint.

---

[6] Because Plaintiffs' *Bivens* claims fail, their claim for declaratory relief must be dismissed as well. The Declaratory Judgment Act, 28 U.S.C. § 2201, does not provide a cause of action. "It is a well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (internal citations, quotations, and alterations omitted). "Rather, the availability of declaratory relief presupposes the existence of a judicially remediable right." *Id.*; *see also Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 619 (4th Cir. 1997) ("[T]he DJA does not provide a source of jurisdiction which is independent of substantive federal law.").

DATED this 6th day of November, 2017.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

DANA J. BOENTE
United States Attorney
Eastern District of Virginia

C. SALVATORE D'ALESSIO, Jr.
Acting Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel

_____/s/_____
DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
E-Mail: dennis.barghaan@usdoj.gov

PAUL E. WERNER
Trial Attorney
Civil Division, Torts Branch
P.O. Box 7146 Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4152
Fax: (202) 616-4134
E-Mail: paul.werner@usdoj.gov

Attorneys for the Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2017, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of this filing to:

Simon Y. Sandoval-Moshenberg
Nicholas Marritz
Legal Justice Aid Center
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
E-Mail: simon@justice4all.org; nicholas@justice4all.org

Daniel E. Johnson
Mark H. Lynch (*pro hac vice*)
Jose E. Arvelo (*pro hac vice*)
Brandon H. Johnson (*pro hac vice*)
Daniel T. Grant (*pro hac vice*)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
E-Mail: dejohnson@cov.com

_____/s/_____
DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3970
Fax: (703) 299-3983
E-Mail: dennis.barghaan@usdoj.gov