**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **MYNOR ABDIEL TUN-COS,** | ) |
| **JOSÉ PAJARITO SAPUT,** | ) |
| **LUIS VELASQUEZ PERDOMO,** | ) |
| **PEDRO VELASQUEZ PERDOMO,** | ) |
| **GERMÁN VELASQUEZ PERDOMO,** | ) |
| **EDER AGUILAR ARITAS,** | ) |
| **EDUARDO MONTANO FERNÁNDEZ,** | ) |
| **NELSON CALLEJAS PEÑA,** | ) |
| **and** | ) |
| **JOSÉ CÁRCAMO** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No.: 1:17-cv-943 (AJT/TCB) |
| **v.** | ) |
| | ) |
| **B. PERROTTE, T. OSBORNE, D. HUN YIM,** | ) |
| **P. MANNEH, and A. NICHOLS,** | ) |
| **ICE AGENTS** | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

1.      This is a civil rights lawsuit challenging stops and home invasions that were conducted by Immigration and Customs Enforcement ("ICE") agents in northern Virginia without a warrant or any reasonable, articulable suspicion of unlawful activity.  Plaintiffs were targeted for these unconstitutional actions solely on the basis of their apparent Latino ethnicity. Plaintiffs Mynor Abdiel Tun-Cos, José Pajarito Saput, Luis Velasquez Perdomo, Pedro Velasquez Perdomo, Germán Velasquez Perdomo, Eder Aguilar Aritas, Eduardo Montano Fernández, Nelson Callejas Peña, and Jose Cárcamo (collectively, "Plaintiffs") bring this lawsuit to seek relief for Defendants' violation of their rights, privileges, and immunities secured by the Fourth and Fifth Amendments to the United States Constitution.

2.      As described below, in the early hours of two mornings in February 2017, ICE Agents B. Perrotte, T. Osborne, D. Hun Yim, P. Manneh, and A. Nichols (collectively, "Defendants") were operating as an ICE "Fugitive Operations Team" in areas of Virginia that are home to many residents of Latino ethnicity.  In violation of the fundamental protections of the Fourth Amendment, the ICE agents (1) stopped and detained some of the Plaintiffs without a reasonable, articulable suspicion of any unlawful activity as Plaintiffs were attempting to go to work; (2) invaded Plaintiffs' homes without a warrant, without voluntary consent, and without probable cause; and (3) seized Plaintiffs, in some cases, while they were still sleeping in their homes.

3.      Defendant ICE agents violated Plaintiffs' clearly established constitutional rights by detaining them at length without a reasonable, articulable suspicion that they had violated the immigration laws—or any other laws—of the United States.  Rather, Defendants stopped and detained Plaintiffs, invaded their homes, and seized them because Plaintiffs appeared to be of Latino race or ethnicity and because of their perceived national origin.

4.      Even if Defendants had a reasonable, articulable suspicion that Plaintiffs had violated the laws of the United States, sufficient to justify the initial stop—which Plaintiffs do not concede—Defendants had no lawful reason to enter and search Plaintiffs' homes. Moreover, the length and intensity of their detention was not "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."  *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

5.      Plaintiffs seek declaratory judgment, compensatory and punitive damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

### Jurisdiction and Venue

6.      The Court has personal jurisdiction over Defendants because Defendants' acts and omissions giving rise to this lawsuit took place in Virginia.

7.      The Court has subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because this action seeks redress for the violation of Plaintiffs' constitutional rights.

8.      Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202.

9.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and 1391(e)(1) because a substantial part of the events giving rise to this claim occurred in the district and because Plaintiffs reside in the district.

### Parties

10.      Plaintiff Jose Cárcamo is of Latino race and ethnicity.  At all times relevant, he has owned and lived in a house on 14th Street South in zip code 22204, in the South Arlington neighborhood of Arlington, Virginia.

11.      Plaintiff Luis Velasquez Perdomo is of Latino race and ethnicity.  At all times relevant, he lived at a house on 14th Street South in zip code 22204, in the South Arlington neighborhood of Arlington, Virginia.

12.      Plaintiff Pedro Velasquez Perdomo is of Latino race and ethnicity.  At all times relevant, he lived at a house on 14th Street South in zip code 22204, in the South Arlington neighborhood of Arlington, Virginia.

13.     Plaintiff Germán Velasquez Perdomo is of Latino race and ethnicity.  At all times relevant, he lived at a house on 14th Street South in zip code 22204, in the South Arlington neighborhood of Arlington, Virginia.

14.     Plaintiff Eder Aguilar Aritas is of Latino race and ethnicity.  At all times relevant, he lived at a house on 14th Street South in zip code 22204, in the South Arlington neighborhood of Arlington, Virginia.

15.     Plaintiff Nelson Callejas Peña is of Latino race and ethnicity.  At all times relevant, he lived at a house on 14th Street South in zip code 22204, in the South Arlington neighborhood of Arlington, Virginia.

16.     Plaintiff Mynor Abdiel Tun-Cos is of Latino race and ethnicity.  At all times relevant, he was a resident of the Fairmont Gardens apartment complex in Annandale, Virginia.

17.     Plaintiff José Pajarito Saput is of Latino race and ethnicity.  At all times relevant, he was a resident of the Fairmont Gardens apartment complex in Annandale, Virginia.

18.     Defendants are ICE agents who, on information and belief, personally participated in the seizures and arrests of Plaintiffs on February 8, 2017 and/or February 17, 2017.  Plaintiffs are unaware of the full first names of these Defendants and therefore sue those Defendants under their first initials and last names, as they appear in Plaintiffs' I-213 Forms and the I-213 Form of another individual arrested along with Mr. Tun-Cos and Mr. Pajarito Saput on February 17, 2017.[1]  Defendants participated in and are directly responsible and liable for the acts and resulting damages alleged in this complaint.  Insofar as Defendants' full names are

---

[1] A Form I-213 is an official record routinely prepared by an immigration officer at the time of the initial processing of an individual suspected of being unlawfully present in the United States.

ascertained during the course of this litigation, Plaintiffs may seek to amend this complaint to allege these names.

## **Statement of Facts**

### Suspicionless Seizure and Warrantless Home Invasion in Arlington, Virginia on February 8, 2017

#### *Seizure in Driveway*

19.     Plaintiff Germán Velasquez Perdomo lives in a house on 14th Street South in Arlington, Virginia.  It is a two-story house and has two entrances: a first-floor entrance that faces the street, and a rear entrance in the back of the house that leads to the basement.  A driveway extends along the length of one side of the house.

20.     On February 8, 2017, at approximately 5:40 AM, Plaintiff Germán Velasquez Perdomo, who appears to be of Latino race and ethnicity, was leaving his home to go to work when he was stopped in his driveway, which was illuminated by streetlights, by four Defendants who had guns visible on their waistbands.  At least four unmarked ICE SUVs were on the street in front of the house.  Germán Velasquez Perdomo was not engaging in any criminal or otherwise suspicious activity.  Germán Velasquez Perdomo had not left the property when he was stopped by Defendants, who approached him from each side and shined a flashlight in his face.  As soon as Defendants surrounded Germán Velasquez Perdomo, he reasonably did not feel free to leave.

21.     Although Germán Velasquez Perdomo's English proficiency is limited, Defendants spoke to Germán Velasquez Perdomo primarily in English, identifying themselves as "police," and told him that they were looking for a specific individual.  Defendants shone their flashlights in Germán Velasquez Perdomo's face, and showed him a photocopy of a photograph of a man they said was named Santo Del Cid, for whom Defendants said they were looking.

Defendants asked Germán Velasquez Perdomo if he knew Mr. Del Cid, to which Germán

Velasquez Perdomo truthfully responded that he did not.

      22.     The encounter did not end there, however. Defendants forced Germán

Velasquez Perdomo to empty his pockets, and they frisked him. Defendants asked Germán

Velasquez Perdomo if he lived at the house and how many others lived with him. Defendants

told Germán Velasquez Perdomo to let them into the house. Germán Velasquez Perdomo

protested that it was early in the morning and the others in the house were still sleeping. As they

stepped onto the property and motioned towards the house, Defendants sounded urgent and

commandingly repeated that Germán Velasquez Perdomo had to let them inside. In light of the

fact that Defendants were armed, identified themselves as "police," had surrounded Germán

Velasquez Perdomo, and commanded that he let them into the house, and due to the presence of

the multiple unmarked SUVs, Germán Velasquez Perdomo reasonably felt compelled to obey

Defendants' instructions.

      23.     Germán Velasquez Perdomo walked up the driveway to the basement door

at the back of the house. The four Defendants followed behind him, effectively restricting his

movement such that the only direction Germán Velasquez Perdomo could go was towards the

basement door. When they arrived at the door, a Defendant ordered Germán Velasquez Perdomo

to open the door. Again, Germán Velasquez Perdomo did not feel free to disobey the

Defendant's orders, so he opened the door.

      24.     At no time did Germán Velasquez Perdomo or anyone else who was in the

house freely give consent for Defendants to enter the home, and Defendants did not present a

warrant. Defendants had no reasonable suspicion to believe that Germán Velasquez Perdomo or

anyone else within the home had violated any law or was engaged in any sort of criminal activity whatsoever.

<em>Search and Seizures in Basement of Home</em>

25.     Once inside the house, Defendants then ordered Germán Velasquez Perdomo to knock on the door of the bedroom shared by his brothers Plaintiffs Pedro Velasquez Perdomo and Luis Velasquez Perdomo in the basement of the home.  Feeling that he had no choice other than to obey Defendants' orders, Germán Velasquez Perdomo told his brothers to open the door because the "police" were looking for someone.  The brothers opened the door, and Defendants entered Pedro Velasquez Perdomo and Luis Velasquez Perdomo's room without obtaining either's consent.

26.     Defendants did not show Pedro Velasquez Perdomo and Luis Velasquez Perdomo, who appear to be of Latino race and ethnicity, the photo of Mr. Del Cid.  Instead, Defendants ordered Pedro Velasquez Perdomo and Luis Velasquez Perdomo to sit on a couch in the basement living area.  Pedro Velasquez Perdomo and Luis Velasquez Perdomo reasonably believed they had no other choice than to obey Defendants' orders and did not feel free to leave, so they complied.

27.     Defendants had no reasonable, articulable suspicion that the Velasquez Perdomo brothers or any other resident of the house had violated the immigration laws of the United States or committed any other violation of U.S. law.

28.     Despite having no lawful reason to do so, Defendants ordered the three Velasquez Perdomo brothers to produce identification proving their legal status.  Germán Velasquez Perdomo and Luis Velasquez Perdomo provided identification, which Defendants kept.  Pedro Velasquez Perdomo did not provide his identification because it was in his car outside.  Defendants ordered Luis Velasquez Perdomo and Pedro Velasquez Perdomo to stay on

7

the basement couch.  Approximately three Defendants stayed in the basement with Luis

Velasquez Perdomo and Pedro Velasquez Perdomo.

<u>*Searches and Seizures on Second Floor of Home*</u>

29.     Defendants ordered Germán Velasquez Perdomo to take them upstairs and

wake the owner of the house.  Germán Velasquez Perdomo again noted that it was very early and

the owner was likely sleeping, but he reasonably believed he could not disobey Defendants'

orders.  Germán Velasquez Perdomo and two Defendants went upstairs.  On the way up the

stairs, Germán Velasquez Perdomo received a phone call on his cell phone from the person who

had come to drive him to work.  One Defendant told him that he could not answer his phone.

30.     Obeying Defendants' orders, Germán Velasquez Perdomo led Defendants

to a second-floor bedroom belonging to Plaintiff Jose Cárcamo.  Mr. Cárcamo is the home

owner.  Mr. Cárcamo and his wife have owned the property since approximately 1999.

31.     As Defendants approached the bedroom door, Mr. Cárcamo, his wife, and

their 12-year-old daughter were asleep inside.  At the Defendants' orders, Germán Velasquez

Perdomo knocked on the bedroom door, and said in Spanish that the police needed to talk to the

owner of the house because they were looking for someone.

32.     When Mr. Cárcamo opened the door to his bedroom, a Defendant stuck

his foot in the doorway to prevent him from closing it.  That Defendant then pushed past Mr.

Cárcamo into the bedroom where his wife and daughter were still sleeping.  The commotion

startled Mr. Cárcamo's wife and woke her up.  The Defendant lifted the covers off Mr.

Cárcamo's 12-year-old daughter and shined a flashlight on her in her nightclothes.  That

Defendant then backed out of the room.  Mr. Cárcamo reasonably felt that he could not leave or

disobey Defendants' orders.

33.     At no time did any of the residents of the home, including the owner, Mr. Cárcamo, or his wife, provide consent, verbal or otherwise, for any of the Defendants to enter any part of the home, including the individual bedrooms.  Defendants continued to have no lawful reason to be present in the home or to detain the residents therein.

34.     Defendants ordered Germán Velasquez Perdomo to return to the basement, where approximately three Defendants stayed with him and the other two Velasquez Perdomo brothers.  Germán Velasquez Perdomo reasonably did not believe that he could disobey Defendants' orders.

35.     The Defendants who remained on the second floor showed Mr. Cárcamo the photograph of Mr. Del Cid, said that ICE was looking for him, and that Defendants "want to see who lives here."  Mr. Cárcamo truthfully told the Defendants that he did not know Mr. Del Cid.

36.     The Defendants then left Mr. Cárcamo's bedroom and continued down the second-floor hallway, ordering Mr. Cárcamo to join them.  One Defendant ordered Mr. Cárcamo to open the first door they encountered.  Mr. Cárcamo protested, informing the agent that his elderly mother-in-law was sleeping in that room.  Nonetheless, the Defendant opened the unlocked door, entered the room where Mr. Cárcamo's 80-year-old mother-in-law was sleeping, ripped the covers off of her, and shined a flashlight on her.  Defendants did not receive consent to enter this bedroom and had no lawful reason to do so.

37.     Two other bedroom doors at the end of the hall were locked.  A Defendant knocked on the next door and told Mr. Cárcamo to open it, an order that Mr. Cárcamo did not feel free to disobey.  This was where Plaintiff Eduardo Montano Fernández lives with his

domestic partner.  Accordingly, Mr. Cárcamo proceeded to tell Mr. Montano Fernández to open the door.

38.     When Mr. Montano Fernández, who appears to be of Latino race and ethnicity, opened the door, a Defendant, still identifying himself as "police," quickly flashed him the photo of Mr. Del Cid and asked Mr. Montano Fernández if he knew Mr. Del Cid.  The Defendant did not show Mr. Montano Fernández the picture for a long period of time, but Mr. Montano Fernández responded truthfully that he did not know Mr. Del Cid.

39.     Hearing the commotion in the hallway, Plaintiff Eder Aguilar Aritas, who appears to be of Latino race and ethnicity, opened his door.  When Mr. Aguilar Aritas opened his door, the Defendant in the hallway did not show him the photo of Mr. Del Cid, but rather instructed Mr. Aguilar Aritas, Mr. Montano Fernández and Mr. Cárcamo to go to the couch on the first floor of the house.  The Defendant ordered the women to remain in the bedrooms.  Mr. Aguilar Aritas, Mr. Montano Fernández, and Mr. Cárcamo reasonably felt that they could not leave or disobey the Defendant's orders.

*Searches and Seizure on First Floor*

40.     When Mr. Aguilar Aritas, Mr. Montano Fernández, and Mr. Cárcamo went to the first floor of the house, there were several armed Defendants in the living room, including at least one blocking the front door.  While several Defendants detained Mr. Aguilar Aritas, Mr. Montano Fernández, and Mr. Cárcamo on the couch, one Defendant searched the entire first floor of the house, looking under and behind furniture, and opening closets.  Again, at no time did Defendants obtain consent to search any portion of the home.

41.     There are two bedrooms on the first floor of the house.  When the Defendant searching the home ordered Mr. Cárcamo to open one of the doors on the first floor, Mr. Cárcamo protested, saying that the man who lives in that room was traveling and not home.

10

Nonetheless, upon the Defendant's renewed demand, Mr. Cárcamo opened the door to the empty room.  The Defendant entered and searched the room without consent.

42.     The Defendant next ordered Mr. Cárcamo to knock on the door of the other bedroom, in which Plaintiff Nelson Callejas Peña and his wife live.  The Defendant entered Mr. Callejas Peña's room and asked Mr. Callejas Peña for identification.  When Mr. Callejas Peña, who appears to be of Latino race and ethnicity, informed the Defendant that his identification was in his car, the Defendant ordered Mr. Callejas Peña's wife to remain in the bedroom and escorted him to the car.  Reasonably believing that he had no other choice but to do so, Mr. Callejas Peña opened the car and retrieved his identification.  The Defendant then escorted Mr. Callejas Peña back into the house and ordered him to sit on the first-floor couch with Mr. Aguilar Aritas, Mr. Montano Fernández, and Mr. Cárcamo.  Mr. Callejas Peña reasonably felt that he could not leave or disobey the Defendant's orders.

43.     Defendants continued to detain Mr. Aguilar Aritas, Mr. Montano Fernández, Mr. Cárcamo, and Mr. Callejas Peña on the first-floor couch despite having no lawful justification to do so and despite the fact that all four men had complied with Defendants' orders.  A Defendant asked Mr. Cárcamo for identification, and Mr. Cárcamo told the Defendant that his identification was upstairs.  A Defendant accompanied Mr. Cárcamo back to his bedroom to retrieve his identification, which he provided to Defendants.

*Arrest*

44.     In the basement, Defendants handcuffed Plaintiffs Germán Velasquez Perdomo, Pedro Velasquez Perdomo and Luis Velasquez Perdomo and took them to one of the unmarked vehicles outside.  At no time were any of the Velasquez Perdomo brothers informed of their legal rights.

45.     On the first floor, after approximately one hour of unlawfully detaining Mr. Aguilar Aritas, Mr. Montano Fernández, and Mr. Callejas Peña in their home, Defendants placed handcuffs on them and arrested them.  At no time were they informed of their legal rights. None of the men were allowed to change from their night clothes, and at least one of them was shirtless and without shoes.

46.     Mr. Cárcamo was not arrested, and told Defendants that he believed Defendants had lied to him when they said they were only looking for Mr. Del Cid.  One Defendant responded that Mr. Cárcamo should not worry and that nothing will happen to the arrested men.  The Defendant then asked Mr. Cárcamo, gesturing to neighboring houses, if there were "other 'Spanish families'" living in the neighborhood. Mr. Cárcamo did not respond.

47.     As the handcuffed men were being led outside, Mr. Cárcamo's wife attempted to record the incident on her phone, but one Defendant shined his light into her camera, pushed her, and told her it was against the law to film police.

48.     Once in the unmarked ICE vehicle, one Defendant told the men, "Don't worry, if you don't have a bad record, you'll be back in three hours."

49.     All six men who were arrested—Plaintiffs Luis Velasquez Perdomo, Pedro Velasquez Perdomo, Germán Velasquez Perdomo, Eder Aguilar Aritas, Eduardo Montano Fernández, and Nelson Callejas Peña —were taken to an ICE facility in Lorton, Virginia, where they were each told that they would be released upon posting $1,500 bond.

50.     The men's families and Mr. Cárcamo did not know where the men were taken.  Since Defendants identified themselves only as "police," their families spent the next several hours calling local police stations to inquire about what happened.  Local police came to

the house and suggested to Mr. Cárcamo and the families that perhaps the officers who had

arrested and taken the men away were agents of ICE.

51.     Mr. Cárcamo called the ICE facility and was told he had one hour to post

the bond, and that this would be the only opportunity to post bond.  The family rushed to the

bank and posted bond.  The men were released after having been detained approximately ten

hours.

52.     The six men who were arrested all missed a full day of work.  Mr.

Cárcamo was able to go to work only for approximately one hour after picking up the other men

from ICE custody.

53.     Mr. Cárcamo's twelve-year-old daughter was so traumatized by the

encounter with the Defendants that she missed three days of school.

54.     None of the seven Plaintiffs detained on February 8, 2017 (the "Arlington

Plaintiffs") resemble Mr. Del Cid at all or know who he is.  Mr. Cárcamo has owned and lived at

the house since approximately 1999, and Mr. Del Cid has not lived there at any time during Mr.

Cárcamo's residency.  Mr. Cárcamo does not know Mr. Del Cid.

Encounter in Fairmont Gardens on February 17, 2017

55.     On February 17, 2017, at approximately 6:25 AM, Plaintiffs Mynor Tun-

Cos and José Pajarito Saput, along with one other individual exited their apartment building in

Fairmont Gardens to go to work.[2]  Once outside the building, they met another individual who

---

[2] According to *The Old Farmer's Almanac*, dawn began breaking on February 17, 2017
approximately one hour before the seizure. *See Sunrise & Sunset for Annandale, VA*, The Old
Farmer's Almanac, https://www.almanac.com/astronomy/rise/VA/Annandale/2017-02-17 (last
visited Nov. 13, 2017).  In fact, the seizure occurred a mere five minutes before the start of civil
twilight, which is the brightest of the three stages of twilight. *See Sun and Moon Data for One
Day,* U.S. Naval Observatory Astronomical Applications Department,
http://aa.usno.navy.mil/rstt/onedaytable?ID=AA&year=2017&month=2&day=17&state=VA&pl

13

had arranged to carpool with them, and the four of them entered Mr. Tun-Cos's vehicle in the

Fairmont Gardens parking lot to drive to work.  All four appeared to be of Latino race or

ethnicity.  Mr. Tun-Cos was driving.  None of the individuals were engaged in any criminal

activity.

      56.     As Mr. Tun-Cos's car pulled out of a parking space, an unmarked black

SUV pulled in front of the car and blocked it from moving.  At this point, and for the rest of the

encounter, Mr. Tun-Cos and Mr. Pajarito Saput reasonably did not feel free to leave.

      57.     Defendants jumped out of the SUV and surrounded Mr. Tun-Cos's car.

Defendants each had a gun visible on their waistbands.  Throughout the encounter that morning

with Defendants, Mr. Tun-Cos and Mr. Pajarito Saput did not feel free to leave or to refuse

Defendants' instructions.  At no time were Mr. Tun-Cos or Mr. Pajarito Saput informed of their

legal rights.

      58.     After Defendants surrounded Mr. Tun-Cos's car, one or more of the

Defendants banged on the car windows, and loudly instructed the passengers to lower their

windows.  Throughout the encounter, Defendants spoke in a mix of English and Spanish, but

primarily in English.  Mr. Tun-Cos and Mr. Pajarito Saput have very limited facility with the

English language.

      59.     Throughout the encounter in the parking lot, Defendants had no

reasonable, articulable suspicion that any of the passengers had violated the immigration laws of

the United States or committed any other violation of U.S. law.

---

ace=Annandale (showing civil twilight time for Annandale, VA) (last visited Nov. 13, 2017);
*Rise, Set, and Twilight Definitions*, U.S. Naval Observatory,
http://aa.usno.navy.mil/faq/docs/RST_defs.php (describing phases of twilight) (last visited Nov.
13, 2017).

60.     Nonetheless, Defendants demanded that each of the four occupants of Mr. Tun-Cos's car produce identification.  Mr. Tun-Cos, Mr. Pajarito Saput, and one of the other individuals in the car complied by providing the identification that they had in their wallets.  The fourth individual in the car was carrying no identification, and thus could not comply.

61.     Defendants ordered the four occupants out of the car.  Mr. Tun-Cos asked if he could park his car, and one Defendant stayed with Mr. Tun-Cos while he parked his car.  Another Defendant returned to the ICE SUV with the men's identification.

62.     Two other Defendants said, "Let's go to your apartment," and directed the three other passengers to the apartment building.  The passengers reasonably believed that they had no choice but to obey the Defendants' command.  One Defendant told Mr. Pajarito Saput that they were all going to go inside the apartment to talk.  Upon arriving at the apartment door, a Defendant instructed Mr. Pajarito Saput to unlock the door.  Mr. Pajarito Saput reasonably believed that he had no choice but to obey the Defendant's command, and opened the door to the apartment.  At no point did Mr. Pajarito Saput or any other individual give consent for Defendants to enter the apartment.  Once in the apartment, one Defendant stood near the apartment entrance.

63.     Mr. Tun-Cos and the Defendant who stayed behind while Mr. Tun-Cos parked his car made their way to the apartment.  At this point, a Defendant showed Mr. Tun-Cos photos of two young men and asked if he knew them.  Mr. Tun-Cos responded truthfully that he was familiar with the two men and that they used to live in the apartment, but that they had moved out about five years ago.  Mr. Tun-Cos told the Defendant that the two men are brothers named Wilber and Carmelino Houx-Hernández (the "Houx-Hernández brothers"), and that Mr. Tun-Cos had kicked them out of the apartment long ago because of their drinking.  The

Defendant asked Mr. Tun-Cos if he knew the Houx-Hernández brothers' current contact information, and Mr. Tun-Cos responded truthfully that he did not.  The same Defendant told Mr. Tun-Cos that the Houx-Hernández brothers were "in trouble with the police" but gave no further reasons why Defendants were looking for them.

64.     Neither Mr. Tun-Cos nor Mr. Pajarito Saput resemble either of the Houx-Hernández brothers (a fact to which Mr. Tun-Cos can attest, as he knew the Houx-Hernández brothers) other than that they all appear to be men of Latino race or ethnicity.  Indeed, the Houx-Hernández brothers are in their mid-20's.  At all times relevant, Mr. Tun-Cos was 42 years old, and Mr. Pajarito Saput was 49 years old.  The other individual who exited the apartment with Mr. Tun-Cos and Mr. Pajarito Saput was approximately 47 years old.  The individual who met them outside to carpool to work was approximately 36 years old.

65.     Despite Mr. Tun-Cos and Mr. Pajarito Saput's cooperation, and without any reasonable reason for doing so, Defendants arrested and frisked both men and took them to an unmarked white van with ladders on top that was apparently designed to look like a construction or painter's van but is actually an ICE detainee transport van.

66.     The encounter in the apartment lasted about thirty minutes.  At no time were Mr. Tun-Cos or Mr. Pajarito Saput informed of their legal rights.

67.     Mr. Tun-Cos and Mr. Pajarito Saput were then taken in that van to an ICE facility in Lorton, Virginia, and later were driven to an ICE office in Fairfax, Virginia, after which point they were released with instructions to return for periodic check-ins with ICE officials.

68.     Mr. Tun-Cos and Mr. Pajarito Saput both missed a full day of work due to Defendants' unlawful seizure.

16

## LEGAL CLAIMS

### Count I: Unreasonable Search and Seizure (Fourth Amendment *Bivens* Claim)

69.     Plaintiffs incorporate the allegations above as if fully made herein.

70.     The requirements of the Constitution are clearly established: before federal law enforcement agents, including ICE agents, may initiate an investigative stop-and-questioning of an individual, the agents must *first* have a reasonable, articulable suspicion that an individual has violated the laws of the United States.

71.     The neighborhoods where ICE targeted Plaintiffs have a higher concentration of people with Latino ethnicity than other neighborhoods in the vicinity.  South Arlington is 30% Latino, compared to 15% for Arlington County.  Fairmont Gardens is a multi-building apartment complex in Annandale, Virginia, a neighborhood long known for its multiethnic population.  Over 27% of Annandale residents and the vast majority of the residents of Fairmont Gardens are of Latino ethnicity.

72.     Defendants did not have a reasonable, articulable suspicion that any of the seven Arlington Plaintiffs had violated any laws when Defendants, acting under color of law, intentionally and willfully seized and searched the seven Arlington Plaintiffs on February 8, 2017.  Defendants' seizure and search of the seven Arlington Plaintiffs and their home without a reasonable, articulable suspicion of wrongdoing violated their clearly established Fourth Amendment right to be free from unlawful seizures.  Defendants had no lawful reason to suspect that they might not have legal status.  Defendants seized them solely based on his apparent race, ethnicity, or perceived national origin.

73.     Even if Defendants had a reasonable, articulable suspicion that might have justified one or more of the initial seizures, which they did not have, Defendants had no lawful reason to extend the seizures and enter the home without consent and without a warrant.

17

Defendants had no freely given consent to enter the home at all, let alone search the entire home, including behind locked doors.

74.     The fact that Defendants showed only some of the Arlington Plaintiffs the photo of Mr. Del Cid briefly, and in some cases not at all, is further evidence that the photograph and "search for Mr. Del Cid" was a mere pretext for the unlawful search and seizure. Defendants seized the Arlington Plaintiffs and searched their home solely based on their apparent race, ethnicity, or perceived national origin.

75.     Defendants physically blocked and prevented the seven Arlington Plaintiffs from moving, demanded identification, and held them against their will for longer than necessary to establish that none of them were the man (Mr. Del Cid) for whom Defendants claim to have been looking.

76.     None of the seven Arlington Plaintiffs detained on February 8, 2017 resemble Mr. Del Cid, the individual for whom Defendants purported to be looking, or know who he is.  Mr. Cárcamo has owned and lived at the house since approximately 1999, and Mr. Del Cid has not lived there at any time during Mr. Cárcamo's residency.

77.     A Defendant ICE Agent's question to Mr. Cárcamo whether there were other "Spanish families" living in the neighborhood is further evidence that Defendant ICE Agents invaded the Arlington Plaintiffs' home due to their apparent race, ethnicity and/or perceived national origin and not due to any reasonable suspicion that they violated any laws.

78.     Defendants also did not have a reasonable, articulable suspicion that Mr. Tun-Cos or Mr. Pajarito Saput had violated any laws when, acting under color of law, they intentionally and willfully stopped their vehicle on February 17, 2017—a stop that also constituted a seizure under the Fourth Amendment.  Defendants' seizure of Mr. Tun-Cos and Mr.

18

Pajarito Saput without a reasonable, articulable suspicion of wrongdoing violated their clearly established right to be free from unlawful seizures.  Defendants had no lawful reason to suspect that Mr. Tun-Cos or Mr. Pajarito Saput might not have legal status.

79.     Even if Defendants were at Fairmont Gardens in a legitimate attempt to locate the Houx-Hernández brothers, Defendants had one or more photographs of the Houx-Hernández brothers and knew or should have immediately known that neither Mr. Tun-Cos nor Mr. Pajarito Saput resembles the Houx-Hernández brothers.  Accordingly, any suspicion that Defendants may have had that Mr. Tun-Cos or Mr. Pajarito Saput were in trouble with the law no longer existed after Defendants quickly determined that they were not the Houx-Hernández brothers.  On information and belief, ICE's own training materials instruct ICE agents that a stop like that of Mr. Tun-Cos and Mr. Pajarito Saput is unconstitutional.

80.     Even if Defendants had a reasonable, articulable suspicion that might have justified the initial stop of Mr. Tun-Cos and Mr. Pajarito Saput's vehicle, which they did not have, the seizure was not sufficiently limited to the scope and duration that would have been adequate to confirm or dispel any possible reasonable suspicion that Mr. Tun-Cos and Mr. Pajarito Saput were the Houx-Hernández brothers: Defendants physically blocked and surrounded the car, demanded identification, entered the apartment without freely given consent or a warrant, and held them against their will for longer than necessary to establish that none of the men were who Defendants were looking for.

81.     Defendants quickly realized that Mr. Tun-Cos and Mr. Pajarito Saput were not the Houx-Hernández brothers but nevertheless continued to detain them against their will and questioned them in their vehicle and in their home without any reasonable suspicion of

wrongdoing.  Defendants profiled, detained, and questioned Mr. Tun-Cos and Mr. Pajarito Saput solely based on their apparent race, ethnicity, or perceived national origin.

82.     Defendants' violation of all Plaintiffs' Fourth Amendment rights was willful, egregious, and done with deliberate indifference to Plaintiffs' clearly established constitutional rights.

83.     As a result of Defendants' actions, all Plaintiffs suffered harm, including but not limited to loss of liberty, loss of income, and violations of their constitutional rights.

## Count II: Fifth Amendment Equal Protection *Bivens* Claim

84.     Plaintiffs incorporate the allegations above as if fully made herein.

85.     Defendants targeted, questioned, and seized Plaintiffs, doing so knowingly and intentionally, because of Plaintiffs' race, ethnicity, and/or perceived national origin in violation of clearly established rights under the equal protection component of the Due Process Clause of the Fifth Amendment.

86.     Defendant ICE agent's question to Mr. Cárcamo whether there were other "Spanish families" living in the neighborhood is further evidence that Defendant ICE Agents invaded the Arlington Plaintiffs' home at least in part due to their apparent race, ethnicity and/or perceived national origin.

87.     Defendants entered Plaintiffs' homes without freely given consent and without a warrant, doing so knowingly and intentionally, because of Plaintiffs' race, ethnicity, and/or perceived national origin in violation of clearly established rights under the equal protection component of the Due Process Clause of the Fifth Amendment.

88.     As a result of Defendants' actions, Plaintiffs suffered harm, including but not limited to loss of liberty, loss of income, and violations of their constitutional rights.

**Relief Requested**

WHEREFORE, Plaintiffs request that the Court enter a judgment against Defendants and award the following:

A.  A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' seizure and questioning of Plaintiffs was a clear violation of Plaintiffs' Fourth and Fifth Amendment rights;

B.  Award Plaintiffs nominal damages for the clear violation of Plaintiffs' Fourth and Fifth Amendment Rights;

C.  Award Plaintiffs compensatory damages in an amount to be proven at trial;

D.  Hold Defendants jointly and severally liable for compensatory damages in an amount to be proven at trial;

E.  Award Plaintiffs punitive damages against each Defendant in an amount to be proven at trial;

F.  Award Plaintiffs the cost of this action and reasonable attorney fees; and

G.  Award such other relief as the court deems just and proper.


**Jury Demand**

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.

Dated:  November 16, 2017                    Respectfully submitted,


**LEGAL AID JUSTICE CENTER**

By: _____//s//_____
Simon Y. Sandoval-Moshenberg (VSB No. 77110)
Hallie Ryan (VSB No. 85927)
Nicholas Marritz (VSB No. 89795)
6066 Leesburg Pike, Suite 520
Falls Church, VA  22041
(703) 720-5605
simon@justice4all.org
hallie@justice4all.org
nicholas@justice4all.org


**COVINGTON & BURLING LLP**

By: _____//s//_____
Daniel E. Johnson (VSB No. 88696)
Mark H. Lynch (*pro hac vice*)
José E. Arvelo (*pro hac vice*)
Brandon H. Johnson (*pro hac vice*)
Daniel T. Grant (*pro hac vice*)
One CityCenter
850 Tenth Street, NW
Washington, DC  20001
(202) 662-5224
dejohnson@cov.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 16, 2017, I uploaded the foregoing document, as well as all attachments thereto, to this court's CM/ECF System, which caused a Notice of Electronic Filing (NEF) to be sent to:

Dennis C. Barghaan, Jr.
Deputy Chief, Civil Division, Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
e-mail: dennis.barghaan@usdoj.gov.

**LEGAL AID JUSTICE CENTER**

By: _____//s//_____
Simon Y. Sandoval-Moshenberg (VSB No. 77110)
6066 Leesburg Pike, Suite 520
Falls Church, VA  22041
(703) 720-5605
simon@justice4all.org