IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MYNOR ABDIEL TUN-COS, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 1:17-cv-943 |
| | ) | |
| B. PERROTTE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

DANA J. BOENTE
United States Attorney
Eastern District of Virginia

C. SALVATORE D'ALESSIO, Jr.
Acting Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel

DENNIS C. BARGHAAN, Jr.
Deputy Civil Chief
2100 Jamieson Avenue
Alexandria, Virginia 22314

PAUL E. WERNER
Trial Attorney
Civil Division, Torts Branch
P.O. Box 7146 Ben Franklin Station
Washington, D.C. 20044

i

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ................................................................................................. 1

PROCEDURAL HISTORY AND BACKGROUND ................................................. 1

  A.  The Original Complaint and Motion to Dismiss. ............................................. 1

  B.  The First Amended Complaint, which raises claims regarding seven separate

      plaintiffs, a separate incident, and not an identical group of defendants. ............................ 3

STANDARD OF REVIEW ..................................................................................... 5

ARGUMENT ......................................................................................................... 5

I.  The INA Removes This Court's Jurisdiction Over Plaintiffs' Claims. ..................................... 6

  A.  Congress, through the INA, aimed to streamline the removal process and to

      prevent piecemeal litigation. .................................................................... 6

  B.  In 8 U.S.C. § 1252(b)(9), Congress streamlined the removal process, precluding

      the review sought in this lawsuit. ................................................................ 7

  C.  Section 1252(b)(9) bars Plaintiffs' claims, some of which have already been raised

      in removal proceedings. ........................................................................... 9

II.  This Court Should Not Imply a Non-Statutory Remedy for Any of the Plaintiffs'

    Constitutional Claims. ............................................................................. 11

  A.  Implying a damages remedy under the Constitution is disfavored. .................................... 12

    i.  The "*ancien regime*" and *Abbasi*. ............................................................ 12

    ii.  The standard for implying a damages remedy. ................................................... 14

  B.  Plaintiffs ask this Court to extend *Bivens* into a new context. ............................................ 16

  C.  The INA is a comprehensive statutory scheme that precludes Plaintiffs' claims. ............... 17

  D.  Other special factors counsel hesitation in this context. .................................................. 19

    i.  The Constitution commits immigration matters to the political branches. ...................... 20

    ii.  Congress's action in the field has been frequent and intense, yet Congress

       has never provided a damages remedy. ......................................................... 211

    iii.  Plaintiffs challenge Executive Branch policy and priorities. ........................................ 222

    iv.  The system-wide costs of inferring a damages remedy counsel hesitation. .................... 23

    v.  Additional practical effects of allowing Plaintiffs' suit to proceed counsel against

       implying a remedy. ................................................................................. 25

III.  Defendants Are Entitled to Qualified Immunity. ................................................................. 27

   A.  The Original Plaintiffs fail to allege that Defendants committed a clearly
established Fourth Amendment violation during the February 17 incident. ....................... 29

   B.  The newly added Plaintiffs have failed to allege which Defendants, and how each
Defendant, personally participated in the alleged events of February 8, 2017. ................... 32

   C.  All Plaintiffs have failed adequately to plead a violation of the Fifth Amendment. ............ 34

CONCLUSION ...................................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Adams v. Bain,*
    697 F.2d 1213 (4th Cir.1982) ........................................................................................ 5

*Aguilar v. ICE,*
    510 F.3d 1 (1st Cir. 2007).............................................................................. 7, 8, 9, 11

*Aguilar v. ICE,*
    811 F. Supp. 2d 803 (S.D.N.Y. 2011) ................................................................... 35, 36

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011)...................................................................................... 37

*Alvarez v. U.S. ICE,*
    818 F.3d 1194 (11th Cir. 2016) ........................................................................... 17, 18

*Alvarez v. U.S. ICE,*
    137 S. Ct. 2321 (2017)................................................................................................. 18

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ............................................................................................. 27, 28

*Arar v. Ashcroft,*
    585 F.3d 559 (2d Cir. 2009) ................................................................................. 18, 20

*Arias v. U.S. ICE Div. of the Dep't of Homeland Sec.,*
    No. 07-cv-1959, 2008 WL 1827604 (D. Minn. Apr. 23, 2008) .................................. 9

*Ashcroft v. al-Kidd,*
    563 U.S 731 (2011) ..................................................................................................... 28

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................ passim

*Behrens v. Pelletier,*
    516 U.S. 299 (1996) .................................................................................................... 26

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................. 27, 28

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
    403 U.S. 388 (1971) ....................................................................................... 2, 12, 14

*Bonhometre v. Gonzales,*
    414 F.3d 442 (3d Cir. 2005) ........................................................................................ 8

*Bryson v. Gonzales,*
    534 F.3d 1282 (10th Cir. 2008) ................................................................................. 33

*Bush v. Lucas,*
    462 U.S. 367 (1983) ......................................................................................... 13, 14, 15

iv

*Butler v. Bank of Am., N.A.*,
    690 F.3d 959 (8th Cir. 2012) ............................................................ 33

*Carlson v. Green*,
    446 U.S. 14 (1980) ................................................................... 12, 14

*Chehazeh v. Att'y Gen.*,
    666 F.3d 118 (3d Cir. 2012) .............................................................. 8

*Cloaninger ex rel. Estate of Cloaninger v. McDevitt*,
    555 F.3d 324 (4th Cir. 2009) .......................................................... 26

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ................................................................... 13, 22

*Dakura v. Holder*,
    772 F. App'x 994 (4th Cir. 2014) ..................................................... 11

*Davis v. Passman*,
    442 U.S. 228 (1979) .................................................................. 12, 14

*Davis v. United States*,
    No. 1:07-cr-254, 2011 WL 13192740 (E.D. Va. Dec. 15, 2011) ............ 30

*De La Paz v. Coy*,
    786 F.3d 367 (5th Cir. 2015) ................................................ 18, 21, 31

*De La Paz v. Coy*,
    137 S. Ct. 2289 (2017) ................................................................... 18

*Durham v. Horner*,
    690 F.3d 183 (4th Cir. 2012) .......................................................... 28

*Evans v. Chalmers*,
    703 F.3d 636 (4th Cir. 2012) .......................................................... 29

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ...................................................................... 13

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ...................................................................... 20

*Galvan v. Press*,
    347 U.S. 522 (1954) ...................................................................... 20

*Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*,
    104 F.3d 616 (4th Cir. 1997) .......................................................... 37

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ...................................................................... 27

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ...................................................................... 28

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ...................................................................... 27

v

*I.N.S. v. Lopez-Mendoza,*
  468 U.S. 1032 (1984) ........................................................................ 23, 24, 25

*J.E. F.M. v. Lynch,*
  837 F.3d 1026 (9th Cir. 2016) ...................................................................... 7, 8

*Lebron v. Rumsfeld,*
  670 F.3d 540 (4th Cir. 2012) ..................................................................... 19, 20

*Madu v. U.S. Att'y Gen.,*
  470 F.3d 1362 (11th Cir. 2006) ....................................................................... 8

*Maldonado v. Holder,*
  763 F.3d 155 (2d Cir. 2014) ........................................................................... 23

*Malik v. Gonzales,*
  213 F. App'x 173 (4th Cir. 2007) ..................................................................... 9

*Marcantonio v. Dudzinski,*
  155 F. Supp. 3d 619 (W.D. Va. 2015) ........................................................ 29, 33

*Minneci v. Pollard,*
  565 U.S. 118 (2012) ...................................................................................... 13

*Mirmehdi v. United States,*
  689 F.3d 975 (9th Cir. 2012) ............................................................. 18, 20, 21

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985) ................................................................................ 26, 27

*Ornelas v. United States,*
  517 U.S. 690 (1996) ...................................................................................... 30

*Rajah v. Mukasey,*
  544 F.3d 427 (2d Cir. 2008) ..................................................................... 24, 25

*Raub v. Bowen,*
  960 F. Supp. 2d 602 (E.D. Va. 2013) ......................................................... 33, 34

*Raub v. Campbell,*
  785 F.3d 876 (4th Cir. 2015) .......................................................................... 28

*Reid v. Georgia,*
  448 U.S. 438 (1980) ...................................................................................... 30

*Reno v. Am.-Arab Anti-Discrim. Comm.,*
  525 U.S. 471 (1999) ................................................................................... 7, 34

*Robbins v. Oklahoma,*
  519 F.3d 1242 (10th Cir. 2008) ...................................................................... 29

*Safar v. Tingle,*
  859 F.3d 241 (4th Cir. 2017) .......................................................................... 28

*Schweiker v. Chilicky,*
  487 U.S. 412 (1988) ................................................................................ 15, 21

*Taft v. Vines*,
  70 F.3d 304 (4th Cir. 1995), *reh'g granted, opinion adopted in relevant part en banc*,
  83 F.3d 681 (4th Cir. 1996)) ................................................................................. 31

*U.S. ex rel. Osheroff v. Humana Inc.*,
  776 F.3d 805 (11th Cir. 2015) ............................................................................... 18

*U.S. ex rel. Vuyyuru v. Jadhav*,
  555 F.3d 337 (4th Cir. 2009) ............................................................................. 5, 10

*United States v. Alcaraz-Arellano*,
  441 F.3d 1252 (10th Cir. 2006) ............................................................................. 24

*United States v. Armstrong*,
  517 U.S. 456 (1996) ....................................................................................... 34, 35

*United States v. Braddock*,
  410 F. App'x 587 (4th Cir. 2011) .......................................................................... 35

*United States v. Brignoni-Ponce*,
  422 U.S. 873 (1975) ............................................................................................. 31

*United States v. Jones*,
  678 F.3d 293 (4th Cir. 2012) ................................................................................ 30

*United States v. King*,
  119 F.3d 290 (4th Cir. 1997) ................................................................................ 30

*United States v. Nicolas-Juan*,
  426 F. App'x 154 (4th Cir. 2011) .......................................................................... 35

*United States v. Stanley*,
  483 U.S. 669 (1987) ....................................................................................... 15, 18

*Walters v. McMahon*,
  684 F.3d 435 (4th Cir. 2012) ........................................................................... 27, 28

*Wilkie v. Robbins*,
  551 U.S. 537 (2007) ............................................................................... 13, 15, 24

*Yanez-Marquez v. Lynch*,
  789 F.3d 434 (4th Cir. 2015) ............................................................................. 9, 25

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ................................................................................... passim

## Statutes

U.S. Const. art. I, § 8, cl. 4 ................................................................................... 20

U.S. Const. amend. IV ............................................................................................. 2

Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. .................................... passim

8 U.S.C. § 1252(a) ........................................................................................... 7

8 U.S.C. § 1252(b)(9) ................................................................................... 6, 7

8 U.S.C. § 1254a ............................................................................................ 19

28 U.S.C. § 2201 ............................................................................................ 37

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,

   Pub. L. 104-208, 110 Stat. 3546 (1996) ..................................................... 6

REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302 (2005) ............................................. 3, 5

<u>Rules</u>

Federal Rules of Civil Procedure 12(b)(1) ................................................... 2, 5

Federal Rules of Civil Procedure 12(b)(6) ..................................................... 18

<u>Other Authorities</u>

H.R. Conf. Rep. 109-72 (2005) ....................................................................... 7

28 C.F.R. § 50.15 ........................................................................................... 26

## INTRODUCTION

This case is about two routine immigration enforcement operations that Plaintiffs are attempting to leverage to alter what they perceive to be certain aspects of the United States' current immigration enforcement policy. Their attempt comes through a personal liability lawsuit raising Fourth and Fifth Amendment claims directly against the line-level United States Immigration and Customs Enforcement (ICE) officers Plaintiffs claim conducted the operations.

Put simply, this individual-capacity lawsuit is not an appropriate avenue to remedy the constitutional challenges levied. Congress has removed this Court's jurisdiction over lawsuits such as this one, which, in addition to attempting to alter Executive Branch policy, threaten both to slow down the immigration removal process Congress has established, and to offer aliens in such proceedings two separate tracks to challenge immigration officials' actions rather than the single channel of review provided by statute. Congress clearly does not want either outcome. Moreover, the Supreme Court recently emphasized that personal-liability lawsuits are not the appropriate method for challenging Executive Branch policy. Additionally, numerous other special factors counsel hesitation in the immigration-enforcement context. Regardless, Defendants are entitled to qualified immunity because Plaintiffs have not properly alleged that any of the Defendants personally participated in the violation of a clearly established constitutional right. In short, this Court should dismiss their suit.

## PROCEDURAL HISTORY AND BACKGROUND[1]

### A.  The Original Complaint and Motion to Dismiss.

Plaintiffs Mynor Tun-Cos and José Saput (the "original Plaintiffs") filed a complaint in

---

[1] For the limited purposes of this motion to dismiss, the Court may assume the veracity only of well-pled factual allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

which they alleged that at approximately 6:25 a.m. on February 17, 2017, they, along with one other unnamed individual, left their apartment in Fairmont Oaks, an apartment complex in Annandale, VA, that has been the site of numerous immigration enforcement operations over the last decade. *See* Dkt. #1, Compl., ¶¶ 18, 20. The apartment Plaintiffs left had been occupied by two brothers—the Houx-Hernández brothers—who "were in trouble with the police" and for whom ICE was searching. *Id.* ¶ 28. Plaintiffs and a fourth unnamed individual entered their vehicle, which was parked in the complex's parking lot, and began to pull out of their parking space. *Id.* ¶¶ 20-21. An SUV then prevented Plaintiffs' vehicle from leaving the parking area, and ICE officials, who got out of the SUV, asked Plaintiffs and the other occupants for identification. *Id.* ¶ 21-22, 25. Plaintiffs provided some form of identification, but one of the other occupants could not. *Id.* ¶ 25.

Plaintiffs and Defendants then returned to Plaintiffs' apartment, where Defendants showed Plaintiff Tun-Cos a photograph of the Houx-Hernández brothers and asked him if he knew them. *Id.* ¶ 28. Tun-Cos admitted they had lived in his apartment in the past, but stated they did not currently live there. *Id.* Defendants then arrested Plaintiffs, transported them to an ICE facility, and released them towards the end of the day. *Id.* ¶¶ 30, 32. Plaintiffs alleged that the Defendants targeted them solely because of their "apparent race, ethnicity, or perceived national origin." *Id.* ¶ 38.

Based on these allegations, Plaintiffs brought two claims against Defendants under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971): one for alleged violation of their Fourth Amendment rights during the initial encounter and the later questioning; and one for alleged violation of their Fifth Amendment equal protection rights. *Id.* ¶¶ 33-43.

Defendants filed a motion to dismiss the original Plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Dkt. #19, raising three independent threshold defenses. First, under the Immigration and Nationality Act (INA), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302 (2005), 8 U.S.C. §§ 1101 *et seq.*, this Court lacks jurisdiction over those claims because the INA channels constitutional challenges such as those of the original Plaintiffs (who are in removal proceedings) through the immigration courts and the courts of appeals. *See* Dkt. #20 at 3-8. Second, under Supreme Court and Fourth Circuit precedent, this Court should not imply a damages remedy for the original Plaintiffs in this new context because numerous special factors counsel hesitation. *See id.* at 8-23 (citing, *e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)). Third, Defendants are entitled to qualified immunity because the original Plaintiffs failed to plead facts demonstrating the violation of a clearly established constitutional right. *See id.* at 23-30.

### B. The First Amended Complaint, which raises claims regarding seven separate plaintiffs, a separate incident, and not an identical group of defendants.

The original Plaintiffs then amended their complaint. *See* Dkt. #25, First Am. Compl. (FAC). The FAC included the following newly added Plaintiffs: Luis Velasquez Perdomo, Pedro Velasquez Perdomo, Germán Velasquez Perdomo, Eder Aguilar Aritas, Eduardo Montano Fernández, Nelson Callejas Peña, and José Cárcamo (the "newly added Plaintiffs"), none of whom raise allegations regarding the events of February 17, 2017. Instead, the allegations of the newly added Plaintiffs wholly involve an alleged ICE operation on February 8, 2017, in Arlington, Virginia, at the house of one José Carcámo. *See id.* ¶¶ 10, 19-24.

The newly added Plaintiffs allege that "four Defendants"—without specifying which four—approached Germán Perdomo, one of the newly added Plaintiffs, at approximately 5:40

3

a.m. on the morning of February 8, 2017, in front of a house in Arlington, and asked whether he

knew of one "Santo Del Cid," and showed him a photocopy of a photograph of Del Cid. *Id.* ¶ 21.

After inquiring about the inhabitants of the house and gaining entrance, unspecified

"Defendants" searched rooms throughout the house while looking for Del Cid. *Id.* at ¶¶ 25-45.

According to the FAC, at times during this search, certain unspecified "Defendants" had various

interactions with some of the newly added Plaintiffs or other inhabitants of the house. *Id.* ¶¶ 29,

32, 36, 46, 47. With the exception of Germán Perdomo, all the newly added Plaintiffs were

found inside of the house. *Id.* All the newly added Plaintiffs except for Cárcamo were arrested by

the "Defendants," transported to an ICE facility in Virginia, and were released later that day. *Id.*

at ¶¶ 49-51. The FAC alleges that numerous other female inhabitants encountered in the house

were not questioned or arrested. *Id.* ¶¶ 32, 36, 39, 42.

The FAC does not contain any factually substantive changes to the allegations in the

original complaint regarding the February 17, 2017, ICE operation. Rather, it solely removes

references to the "Trump Administration's" purported immigration enforcement policy, *compare*

Dkt. #1, Compl. ¶¶ 5, 15, *with* Dkt. #25, FAC, ¶¶ 1-5, and adds general allegations regarding the

ethnic composition of Annandale. *See* Dkt. #25, Am. Compl., ¶ 71. Both the original Plaintiffs

and the newly added Plaintiffs bring two claims under *Bivens*: one for purported violation of

their Fourth Amendment rights, and one for purported violation of their equal protection rights

under the Fifth Amendment. *See* FAC at 17-20.  Under a modified scheduling order, Defendants'

motion to dismiss the FAC is currently due two weeks after representation was authorized for

Defendants on the newly added claims. *See* Dkt. #27.[2]

---

[2] On December 17, 2017, the Department of Justice authorized representation for the Defendants
with respect to the newly added Plaintiffs' allegations regarding the incident on February 8.

Defendants now move to dismiss all of the Plaintiffs' claims in the FAC under largely the same grounds raised in their motion to dismiss the original complaint. Namely, the INA removes this Court's jurisdiction over those claims as to all Plaintiffs except for Cárcamo (who was not arrested and is not in removal proceedings); under Supreme Court, Fourth Circuit, and other circuit court precedent, multiple special factors counsel hesitation in this context as to all the Plaintiffs' claims; and Defendants are entitled to qualified immunity on all the claims.

## STANDARD OF REVIEW

Defendants raise arguments under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). When a defendant "challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)). "Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute,' the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings . . . ." *Vuyyuru*, 555 F.3d at 348 (quoting *Adams*, 697 F.2d at 1219).

When considering a motion to dismiss under Rule 12(b)(6), the court ignores non-factual content, such as "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal citations and quotations omitted). The court then assumes the truth of well-pled factual allegations and determines whether those factual allegations plausibly state a claim upon which relief may be granted.

## ARGUMENT

This Court should dismiss Plaintiffs' claims for three independent reasons. First, the INA removes this Court's jurisdiction over those claims (with the exception of Cárcamo's) and

channels review through the immigration courts and the federal courts of appeals. Second, this

Court should not imply the non-statutory remedy Plaintiffs seek where, as here, multiple special

factors counsel hesitation in this new context. Third, Defendants are entitled to qualified

immunity because Plaintiffs have failed adequately to allege any Defendant personally

participated in the violation of any clearly established constitutional right.

I.      **The INA Removes This Court's Jurisdiction Over Plaintiffs' Claims.[3]**

Under § 242(b)(9) of the INA, 8 U.S.C. § 1252(b)(9), this Court lacks jurisdiction to

consider Plaintiffs' claims, which must instead be raised either in immigration court or before the

Fourth Circuit in a petition for review. Congress, through the INA, intended to streamline the

removal process and to prevent the sort of piecemeal litigation and parallel proceedings in which

the Plaintiffs—two of whom have already raised their constitutional claims both in this suit and

in their removal proceedings—are currently engaged. It enacted a specific provision to channel

claims such as Plaintiffs' to the federal courts of appeals. Thus, this Court lacks jurisdiction here.

A.  **Congress, through the INA, aimed to streamline the removal process and to prevent piecemeal litigation.**

Congress has added and amended several sections of the INA over the past decades to

streamline the removal process and to ensure that piecemeal litigation, which often arose in

removal proceedings before those amendments, came to an end. For example, in 1996, Congress

passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-

208, 110 Stat. 3546 (1996), which contained provisions reiterating that only courts of appeals,

not district courts, could review final orders of removal, and that review of a final order of

removal was the only method by which to review any issue raised in a removal proceeding. *See*

---

[3] This argument is not raised as to Plaintiff Cárcamo, who was not arrested or placed in removal proceedings.

H.R. Conf. Rep. 109-72, 173 (2005). Such provisions "were intended to preclude all district court review of any issue raised in a removal proceeding." *Id.* Congress again amended the INA in 2005 through the REAL ID Act, and again aimed to end the "piecemeal review, uncertainty, lack of uniformity, and . . . waste of resources both for the judicial branch and Government lawyers" that persisted through judicial review in both district courts and courts of appeals. *Id.* at 174. *See also Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (quoting H.R. Conf. Rep. 109-72).

### B.  In 8 U.S.C. § 1252(b)(9), Congress streamlined the removal process, precluding the review sought in this lawsuit.

In 8 U.S.C. § 1252(b)(9), Congress provided that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order . . . ." Section 1252(b)(9) is an "unmistakable 'zipper' clause." *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483 (1999) ("*AADC*"). Congress's purpose in enacting this clause "is evident." *Aguilar*, 510 F.3d at 9. It is meant "to consolidate and channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process." *Id.*

Under that process, the sole avenue of judicial review is through the courts of appeals. As § 1252(a)(5) adds, "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal . . . ." Combined with § 1252(a)(5), the zipper clause of § 1252(b)(9) means that "*any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only*" through a petition for review before a court of appeals. *J.E. F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). These provisions "effectively limit all aliens to one bite of the apple with regard to challenging an order

of removal." *Bonhometre v. Gonzales*, 414 F.3d 442, 446 (3d Cir. 2005). *See also Aguilar*, 510 F.3d at 9 ("In enacting section 1252(b)(9), Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings." (citing H.R. Rep. No. 109-72)).

Section 1252(b)(9)'s "expanse is breathtaking." *Aguilar*, 510 F.3d at 9. As the First and Ninth Circuits have held, it applies to all claims that arise from either an action or proceeding brought in connection with the removal of an alien, except for claims that are "independent of, or wholly collateral to, the removal process." *Id.* at 11. *See also J.E. F.M.*, 837 F.3d at 1032. Although the precise contours of which claims are "independent" or "wholly collateral" is unsettled, the case law makes clear that claims that commonly arise in the context of removal proceedings fall within the ambit of § 1252(b)(9). *See Aguilar*, 510 F.3d at 13 ("The frequency with which right-to-counsel claims arise in removal proceedings refutes any notion that such claims are sufficiently separate from removal proceedings to be considered either 'independent' or 'collateral.'"); *J.E. F.M.*, 837 F.3d at 1033 (applying § 1252(b)(9) to right-of-counsel claims because they "are routinely raised in petitions for review filed with a federal court of appeals").[4]

Along those lines, aliens cannot "escape the vise-like grip of section 1252(b)(9)" by simply refusing to bring claims in immigration court and in petitions for review when those claims could have been brought. *Aguilar*, 510 F.3d at 9. Applying the statute otherwise would herald "an obvious loss of efficiency and bifurcation of review mechanisms," which "are among the principal evils that Congress sought to avoid through the passage of section 1252(b)(9)." *Id.*

---

[4] The Fourth Circuit has not addressed the scope of § 1252(b)(9). Two other circuits have interpreted § 1252(b)(9) more narrowly as applying only to review of a removal order. *See Chehazeh v. Att'y Gen.*, 666 F.3d 118, 131-33 (3d Cir. 2012); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006).

at 10. Nor does it matter that certain actions that are challenged occurred before removal proceedings began. As the *Aguilar* court explained, applying the statute only to claims that arise from ongoing removal proceedings "would put an undue premium on which party rushed to the courthouse first." *Id.* "More importantly," the First Circuit continued, "such a reading would render the word 'action' superfluous and effectively excise it from the statute." *Id.*

### C.  Section 1252(b)(9) bars Plaintiffs' claims, some of which have already been raised in removal proceedings.

As the above explanation of § 1252(b)(9) makes clear, that provision applies to Plaintiffs' claims under the Fourth and Fifth Amendments. Two reasons support this conclusion. First, Plaintiffs' claims for alleged violations of the Fourth Amendment and their equal protection rights are commonplace in removal proceedings. *See, e.g.*, *Yanez-Marquez v. Lynch*, 789 F.3d 434, 445-51 (4th Cir. 2015) (discussing the standard for suppression of evidence in immigration removal proceedings for Fourth Amendment violations); *Malik v. Gonzales*, 213 F. App'x 173, 174 (4th Cir. 2007) (considering equal protection claims in context of removal proceedings). Therefore, those claims are not "independent" or "wholly collateral" from removal proceedings. Indeed, a district court applied § 1252(b)(9) to bar claims markedly similar to those brought by Plaintiffs. *See Arias v. U.S. ICE Div. of the Dep't of Homeland Sec.*, No. 07-cv-1959, 2008 WL 1827604 (D. Minn. Apr. 23, 2008). In *Arias*, aliens arrested during ICE operations brought constitutional tort claims against ICE officials for, among other things, purported Fourth Amendment and Fifth Amendment equal protection violations. The court dismissed the claims, holding that § 1252(b)(9) stripped it of jurisdiction. *See id.* at *5-6.

Second, the two original Plaintiffs have *already raised* the exact same Fourth Amendment claim—and effectively has also raised the same Fifth Amendment claim—in the

removal proceedings the Government has instituted against them. *See* Ex. 1, Tun-Cos Mot. to Suppress Evid. & Term. Procs., at 7-12; Ex. 2, Saput Mot. to Suppress Evid. & Term. Procs., at 7-12.[5] Those motions are currently pending before the immigration court. Accordingly, an immigration judge is *already considering* their Fourth Amendment, and, by dint of their allegations, their Fifth Amendment claims.

This is precisely the sort of situation that Congress wanted to avoid through enacting § 1252(b)(9). By pursuing these parallel proceedings, the original Plaintiffs obtain for themselves "two bites" of the proverbial apple—one before the immigration judge (and potentially later before the Fourth Circuit in a petition for review), and another before this Court. Moreover, by asking two separate bodies to adjudicate the same alleged facts, Plaintiffs consume scarce judicial and Executive Branch resources and create the very "piecemeal review, uncertainty, and lack of uniformity" that Congress sought to obviate through its amendments to the INA. Moreover, it is not a stretch to imagine that two forums might reach different conclusions on nearly identical legal issues based on the exact same factual underpinning. Both proceedings could then be appealed to the same (or, depending on where suit was filed, potentially a different) court of appeals. Nor is it a stretch, given such a possible outcome, that one body would opt to stay its proceedings to allow the other to consider the issues Plaintiffs raise first. Such an outcome either would be the antithesis of the streamlined process for removal proceedings that Congress sought to construct through the jurisdiction-stripping provisions of the INA, including § 1252(b)(9), or would effectively deprive the Defendants of defenses to which they are entitled, as will be explained below. *See infra* Part II.D.v.

---

[5] Courts may consider facts beyond the complaint to determine their jurisdiction. *See Vuyyuru*, 555 F.3d at 347 (citation omitted).

And of the newly added Plaintiffs, six are also in removal proceedings, *see* Ex. 3, Notices to Appear, and can therefore raise their constitutional claims before the immigration court in those proceedings, just as the original Plaintiffs have.[6] Indeed, as detailed above, these newly added Plaintiffs do not have the option of choosing one forum over the other to raise their constitutional challenges. *See Aguilar*, 510 F.3d at 9-10. Rather, raising their constitutional claims in their removal proceedings is how Congress intended for them to proceed.

Because Plaintiffs' claims are commonplace in removal proceedings—and two Plaintiffs' claims in fact have been raised there—§ 1252(b)(9) removes this Court's jurisdiction over those claims. Therefore, this Court must dismiss the claims of the eight Plaintiffs in removal proceedings for lack of subject matter jurisdiction and allow the immigration court to address Plaintiffs' constitutional contentions.

## II.    This Court Should Not Imply a Non-Statutory Remedy for Any of the Plaintiffs' Constitutional Claims.

Even without the jurisdictional bar of § 1252(b)(9), this Court should dismiss all the Plaintiffs' claims because under both recent Supreme Court precedent and Fourth Circuit precedent, they raise numerous special factors counselling hesitation which preclude any *Bivens* remedy. Plaintiffs ask this Court to infer a damages remedy in a new context the Supreme Court has never recognized, immigration enforcement operations carried out in search of specific aliens during which other aliens are encountered and detained. Congress has already established—and frequently modified over the years—a comprehensive statutory scheme in this new context, a fact three other circuits have noted, and this established process and significant and ongoing

---

[6] A Notice to Appear initiates removal proceedings against an alien. *See Dakura v. Holder*, 772 F. App'x 994, 995 (4th Cir. 2014).

congressional attention to the immigration arena preclude supplementing the legislative scheme

Congress has crafted. Moreover, implying a damages remedy in the immigration context, which

is constitutionally committed to the political branches, raises a multitude of concerns regarding

the administrability of such a remedy and its practical implications, concerns the Fourth Circuit

has already recognized in another context in which it refused to imply a damages remedy.

**A.  Implying a damages remedy under the Constitution is disfavored.**

**i.      The *"ancien regime"* and *Abbasi*.**

Plaintiffs ask this Court to create a damages remedy for them under *Bivens*, an action that

"is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). In

*Abbasi*, the Supreme Court explained that *Bivens*, which was decided over forty-five years ago,

arose in a different legal "interpretive framework" under which courts "assumed it to be a proper

judicial function to provide such remedies as are necessary to make effective a statute's

purpose." *Id.* at 1855 (internal quotations and citations omitted). Under this "*ancien regime*," *id.*,

the *Bivens* Court "held that courts must adjust their remedies so as to grant the necessary relief

when federally protected rights have been invaded." *Id.* (internal quotations and citations

omitted). *Bivens* itself provided a damages remedy under the Fourth Amendment for a United

States citizen arrested without a warrant in his home in Brooklyn on drug charges. *See Bivens*,

403 U.S. at 389. In the decade after *Bivens*, and still under the then-prevailing legal framework,

the Court expanded *Bivens* into only two new contexts: "a claim against a Congressman for

firing his female secretary; and a claim against prison officials for failure to treat an inmate's

asthma." *Abbasi*, 137 S. Ct. at 1860 (reciting facts in *Davis v. Passman*, 442 U.S. 228 (1979),

and *Carlson v. Green*, 446 U.S. 14 (1980)).

But in the more than three decades since *Carlson*, the legal landscape has shifted away

from implied causes of action, and the Court has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Abbasi*, 137 S. Ct. at 1857 (citing and quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). Indeed, in the nine cases that came before the Court in that time period—ten including *Abbasi*—the Court held that a *Bivens* remedy was not available. *See, e.g.*, *Abbasi*, 137 S. Ct. at 1863 (rejecting claims by post-September 11 detainees against Executive Branch officials); *Minneci v. Pollard*, 565 U.S. 118, 120 (2012) (rejecting claims by federal prisoner against guards at private prison); *Wilkie v. Robbins*, 551 U.S. 537, 547-48 (2007) (rejecting claims against Bureau of Land Management officials for allegedly pushing "too hard" in the execution of their duties); *Malesko*, 534 U.S. at 63 (rejecting claim against private prison operator); *FDIC v. Meyer*, 510 U.S. 471, 473-74 (1994) (rejecting claim against federal agency). The Court itself has gone so far as to note that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1856. Although the Court has not abrogated *Bivens*, it has emphasized—repeatedly—that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (quoting *Iqbal*, 556 U.S. at 675).

Accordingly, the Court explained that when a party "seeks to assert an implied cause of action under the Constitution . . . separation-of-powers principles are or should be central to the analysis." *Abbasi*, 137 S. Ct. at 1857. "The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). And because "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others," *Abbasi*, 137 S. Ct. at

1858, the Court offered this answer: "most often it will be Congress." *Id.* at 1857. That is

because when an issue "involves a host of considerations that must be weighed and appraised, it

should be committed to those who write the laws rather than those who interpret them." *Id.*

(quoting *Bush*, 462 U.S. at 380) (internal quotations omitted).

ii.     **The standard for implying a damages remedy.**

*Abbasi* also clarified the standard for evaluating whether to imply a damages remedy

under *Bivens*. First, a court must determine whether recognizing a remedy would extend *Bivens*

into a new context. The Court narrowly defined "new context" as an instance where "the case is

different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id.*

at 1859. In other words, if the case is different "in a meaningful way" from either Fourth

Amendment claims against federal law enforcement officers for a domestic search and seizure of

a United States citizen on suspected drug offenses, *see Bivens*, 403 U.S. at 389; Fifth

Amendment claims for the firing of a female congressional secretary based on her gender, *see*

*Davis*, 442 U.S. at 230; or Eighth Amendment claims against prison officials for failing to treat

an inmate's asthma, causing him death, *see Carlson*, 446 U.S. at 19, then the context is new.

The Court then offered a non-exhaustive list of examples that could "prove instructive" in

determining whether differences are meaningful. *Abbasi*, 137 S. Ct. at 1860. That list included,

among others, the following three examples: (1) "the statutory or other legal mandate under

which the officer was operating"; (2) "the risk of disruptive intrusion by the Judiciary into the

functioning of other branches"; and (3) "the presence of potential special factors that previous

*Bivens* cases did not consider." *Id.* Each of these examples alone could render the context new.

*Id.* Moreover, seemingly minor differences, if meaningful, can present a new context. As the

Court in *Abbasi* noted, "even a modest extension is still an extension." *Id.* at 1864.

14

If a plaintiff seeks to extend *Bivens* into a new context, then the court *must* address whether special factors counsel hesitation. *See id.* at 1860. To answer this question, the Supreme Court has engaged in a two-step inquiry identified in *Wilkie*. The court first asks whether Congress has instituted "any alternative, existing process for protecting" a plaintiff's interests, 551 U.S. at 537, or any "meaningful safeguards or remedies" for the plaintiff. *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988). Such actions by Congress imply that it "expected the Judiciary to stay its *Bivens* hand" and not infer a new damages remedy. *Wilkie*, 551 U.S. at 554; *see, e.g.*, *Abbasi*, 137 S. Ct. at 1863 ("And when alternative methods of relief are available, a *Bivens* remedy usually is not."); *Chilicky*, 487 U.S. at 429; *Bush*, 462 U.S. at 390.  That Congress's scheme may not provide the precise remedy a plaintiff seeks, such as damages, does not alter this analysis. *See United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [defendants] an 'adequate' federal remedy for his injuries.").

Second, even if no alternative process exists, the court considers whether there are any additional "special factors counselling hesitation." *Wilkie*, 551 U.S. at 550. Although the Court "has not defined" that phrase, the "necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. The threshold for being a special factor is quite low. Indeed, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* The *Abbasi* Court did not provide an exhaustive list of special factors counselling hesitation, but it did provide several examples, including a lawsuit in which a plaintiff effectively challenges a broad government policy. *See Abbasi*, 137 S. Ct. at 1860 ("[I]t

must be noted that a *Bivens* action is not a proper vehicle for altering an entity's policy." (internal citation and quotation omitted)).

### B.  Plaintiffs ask this Court to extend *Bivens* into a new context.

Here, Plaintiffs undoubtedly ask this Court to extend *Bivens* into a new context. Plaintiffs' claims fall within the three examples of meaningful differences identified by the Supreme Court, and they clearly seek to extend *Bivens* into a context the Supreme Court has never considered. First, the Defendants in this case were operating under a different "statutory or other legal mandate," *Abbasi*, 137 S. Ct. at 1860, than the officials in *Bivens*, *Davis*, or *Carlson*. Specifically, all Defendants are ICE officials who were conducting immigration enforcement operations under the statutory mandate of the INA. They are tasked with identifying, locating, and removing aliens unlawfully present in this country, irrespective of whichever administration they serve. In contrast, the traditional law enforcement officials in *Bivens*, the federal workplace supervisor in *Davis*, and the prison officials in *Carlson* all operated under entirely different legal frameworks. Indeed, the Supreme Court has never permitted a claim to proceed in the context of immigration enforcement.

Second, Plaintiffs' claims risk the "disruptive intrusion by the Judiciary into the functioning of other branches," *Abbasi*, 137 S. Ct. at 1860, in a way that was not present in *Bivens* or its progeny. As already detailed in Part I, Plaintiffs' claims risk disrupting the streamlined removal process Congress has enacted and thereby potentially obtaining two separate rulings from two adjudicatory bodies on the same issue, or staying those proceedings so as to avoid such a possibility, and thereby delaying the removal process. Such an outcome stymies both the Legislative Branch's deliberate design of a streamlined process and the Executive Branch's immigration policy. It also undermines the primacy of those branches in this

16

area. No such risks were present in *Bivens* or its progeny.

Third, this case presents "potential special factors that previous *Bivens* cases did not consider." *Abbasi*, 137 S. Ct. at 1860. In addition to the concerns of delay in immigration proceedings already mentioned, and as explained more fully below, *see infra* Part II.D.v., those claims have the potential of exposing personal-liability defendants to cross-examination in evidentiary hearings in those proceedings without personal representation, thereby effectively abrogating any qualified immunity defenses those defendants may have. Moreover, if the Government were to move to stay such proceedings until the resolution of any *Bivens* claims—a process that can take years—that would substantially increase the incentive for an alien to file just such a suit in the hopes of delaying his or her removal, thereby encouraging litigation against line-level ICE officers. This is turn risks chilling immigration enforcement. No comparable considerations arose in the contexts in which the Supreme Court implied a damages remedy.

Any one of the above differences alone would be "meaningful" enough to establish this as a new context. *See Abbasi*, 137 S. Ct. at 1860. Together, they undoubtedly do. All the more so given that "the new-context inquiry is easily satisfied." *Id.* at 1865. Because Plaintiffs' claims arise in a new context, this Court must determine whether any special factors are present.

### C.  The INA is a comprehensive statutory scheme that precludes Plaintiffs' claims.[7]

As at least three circuits—the Fifth, Ninth, and Eleventh—have all held, the INA is a comprehensive scheme that precludes a court from implying a damages remedy in the immigration enforcement context. *See Alvarez v. U.S. ICE*, 818 F.3d 1194, 1208-10 (11th Cir. 2016); *De La Paz v. Coy*, 786 F.3d 367, 375-78 (5th Cir. 2015); *Mirmehdi v. United States*, 689

---

[7] This section does not apply to the claims of Plaintiff Cárcamo, who is not in removal proceedings.

F.3d 975, 982-83 (9th Cir. 2012). *Cf. Arar v. Ashcroft*, 585 F.3d 559, 573 (2d Cir. 2009) (noting that given "the complexity of the remedial scheme Congress has created (and frequently amended), we would ordinarily draw a strong inference that Congress intended the judiciary to stay its hand and refrain from creating a *Bivens* action in this context" but not deciding that question in light of the case's unique circumstances and other special factors present). In two of those cases—*Alvarez* and *De La Paz*—the Supreme Court denied certiorari a week after deciding *Abbasi. See Alvarez*, 137 S. Ct. 2321 (2017); *De La Paz*, 137 S. Ct. 2289 (2017).

The Fifth Circuit's decision in *De La Paz* explains why refusing to imply a remedy in the immigration context makes sense. There, the court first walked through the numerous safeguards the INA provides to individuals in removal proceedings, noting that the INA provides aliens with notice of proceedings, an adversarial removal hearing, the right to counsel at the hearing, the right to present and examine evidence, an appeals process to both the Board of Immigration Appeals and a federal court of appeals, and standards under which law enforcement personnel must operate and conduct themselves. *See De La Paz*, 786 F.3d at 375-76 (citing various provisions of the INA); *see also Alvarez*, 818 F.3d at 1208 (similarly explaining the various procedural safeguards the INA provides aliens). These provisions provide ample safeguards to the rights Plaintiffs claim were violated. In fact, under the above scheme, the original Plaintiffs have already sought redress for the alleged violation of those very rights. *See* Exs. 1, 2.[8] That the INA does not provide the specific remedy that Plaintiffs seek—money damages—does not mean this Court should imply one. *See Stanley*, 483 U.S. at 683 ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [defendants] an 'adequate' federal

---

[8] "Courts may take judicial notice of publicly filed documents" in considering a Rule 12(b)(6) motion. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).

remedy for his injuries."). *See also infra*, Part II.D.ii. In sum, the INA is an elaborate, carefully constructed remedial scheme that provides adequate protections and safeguards to aliens. Under the first step of the two-step inquiry laid out by the Supreme Court, and under substantial circuit court precedent, this Court should dismiss the claims of the eight Plaintiffs in removal proceedings.

### D.  Other special factors counsel hesitation in this context.[9]

The above conclusion is all the more sound when one considers the separation-of-powers concerns and the "problems of administrability" implicated by inferring a damages remedy here. *Lebron v. Rumsfeld*, 670 F.3d 540, 553 (4th Cir. 2012). The Fourth Circuit has recognized that such concerns and problems are highly relevant when determining whether to imply a remedy under *Bivens*. In *Lebron*, the court dismissed on special factors grounds the *Bivens* claims of a United States citizen detained domestically as a suspected terrorist, noting those claims involved an area which the Constitution committed to Congress and the Executive, and that numerous administrability concerns and undesirable practical effects would flow from inferring a remedy for the plaintiff. *See id.* at 548-49, 553-54 (discussing the constitutional commitment of national security and military affairs to the political branches, and the practical effects a damages remedy would have on national security policymaking, ongoing intelligence operations, and the command structure of the military). Although the context of Plaintiffs' claims is not the same as

---

[9] This section, and to varying degrees all of the following sections except for section D.v., apply to Plaintiff Cárcamo's claims as well. Although Cárcamo was not arrested or placed in removal proceedings because he has Temporary Protected Status, *see* Ex. 4, Hrg. Rpt., at 2, his status and ability to remain in the United States are governed by provisions of the INA. *See* 8 U.S.C. § 1254a. Indeed, § 1254a(c)(3) includes annual requirements and other conditions for Cárcamo to retain his status, thereby placing him under the jurisdiction of the INA. Given this, the INA's comprehensive nature, and, as described below, the INA's silence regarding damages remedies for aliens alleging constitutional harms who are subject to its ambit, the special factors arguments detailed in these sections apply to Cárcamo's claims.

that in *Lebron*, the overarching concerns regarding the separation of powers and administrability mentioned above—which the Fourth Circuit discussed at length—are clearly present.

### i. The Constitution commits immigration matters to the political branches.

First and foremost, Plaintiffs' claims raise separation-of-powers concerns. Congress has plenary control over immigration matters. *See* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization . . . ."); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (internal citations and quotation marks omitted)); *Galvan v. Press,* 347 U.S. 522, 531 (1954) (the principle that "the formulation of these policies [concerning the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government"). And as explained, *supra*, Congress has repeatedly exercised its immigration authority, and has specifically identified the forum in which challenges of this nature are to be raised, a forum that does not include federal district court.

Moreover, "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation.'" *Mirmehdi*, 689 F.3d at 982 (quoting *Arar*, 585 F.3d at 574). Those matters, in turn, are constitutionally committed to Congress and the Executive. *See Lebron*, 670 F.3d at 548-49. As the Fourth Circuit in *Lebron* recognized, 670 F.3d at 548, and as the Supreme Court in *Abbasi* confirmed, "separation-of-powers principles are or should be central to the analysis" of whether to recognize a damages remedy. *Abbasi*, 137 S. Ct. at 1857. Here, this factor squarely counsels against creating a *Bivens* remedy.

> **ii.     Congress's action in the field has been frequent and intense, yet Congress has never provided a damages remedy.**

Congress has exercised its plenary control over immigration by enacting and repeatedly modifying the INA. Yet it has never created a damages remedy for an alien within that scheme. This does not mean courts should supplement Congress's judgment. Quite the opposite. Given Congress's "repeated and careful attention to immigration matters," *De La Paz*, 786 F.3d at 377, its omission of that remedy from the INA cannot be said to have "been inadvertent." *Id.* (quoting *Schweiker*, 487 U.S. at 423). Indeed, since enacting the INA in 1952, Congress has amended it at least six times. *De La Paz*, 786 F.3d at 377 (listing statutes). Despite those repeated amendments, Congress has never provided a damages remedy.

This "institutional silence speaks volumes." *Id.* It also "counsels strongly against judicial usurpation of the legislative function." *Id. See also Abbasi*, 137 S. Ct. at 1862 (noting that where policies "attract the attention of Congress," yet "Congress fails to provide a damages remedy," then "it is much more difficult to believe that 'congressional inaction' was 'inadvertant'" (citing *Schweiker*, 487 U.S. at 423)); *Mirmehdi*, 689 F.3d at 982 ("Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the Immigration and Nationality Act, Congress never created such a remedy." (citation omitted)). Thus, not only do claims in this arena "have the natural tendency" to affect other areas constitutionally committed to the political branches, but Congress, despite its frequent attention to immigration in general and the INA in particular, has never provided a damages remedy. Under these circumstances, this Court should not supplant the legislative function. It should dismiss Plaintiffs' complaint.

### iii.    Plaintiffs challenge Executive Branch policy and priorities.

Furthermore, Plaintiffs implicitly call for a different immigration enforcement system than the one purportedly in place, and thereby challenge federal policy in the immigration arena. Although the original Plaintiffs amended their complaint to remove all references to the "Trump Administration's" alleged policy of "collateral rests" and other statements by high-level administration officials as a cause for their arrests, *compare* Dkt. #1, Compl. ¶¶ 5, 15, *with* Dkt. #25, FAC, ¶¶ 1-5, they cannot escape the fact that they included those references in setting the context of the original complaint—which, in terms of substantive factual allegations, remains unchanged as to the February 17 incident—and have now added seven separate Plaintiffs from a separate incident in which unlawful aliens who were not the specified target of an operation were arrested, and argue that the two sets of claims are related. Plaintiffs' opposition to Defendants' motion, denied without prejudice, under Rules 20 and 21 also demonstrates that Plaintiffs' actual target is the perceived immigration enforcement policies and practices of ICE in Virginia and nationwide. *See* Dkt. #33 at 7-8. This reveals that, at bottom, Plaintiffs in fact challenge the purported Executive Branch policy of conducting "collateral arrests," that is, the arrest of unlawfully present aliens who are located during a search for a specific target. Thus, in effect, Plaintiffs bring this personal-liability lawsuit against five line-level agents based on purported immigration policies adopted by the Executive Branch.

But as the *Abbasi* Court emphasized, "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 72). Moreover, as the Court explained, even if a complaint "is confined to the conduct of a particular Executive Officer in a discrete instance," the claims nonetheless may "call into question the formulation and implementation of a general policy." *Id.* That is the clear aim of this lawsuit. As the Court

concluded, "[w]ere this inquiry to be allowed in a private suit for damages, the *Bivens* action would assume dimensions far greater than those present in *Bivens* itself, or in either of its two follow-on cases." *Id.* at 1861. This is yet another special factor counselling against implying a remedy here.

Furthermore, Plaintiffs' FAC, which raises claims based on the arrest of unlawful aliens who were not the target of the alleged ICE operations, implicitly calls for this Court to endorse an immigration enforcement regime under which ICE officials apprehend only the specific, already known targets of any operations. Such a regime would "render egregious (and therefore forbidden) ICE raids on sweatshops, forced brothels, and other settings in which illegal aliens are exploited and threatened—and much worse." *Maldonado v. Holder*, 763 F.3d 155, 162 (2d Cir. 2014). As the Second Court aptly concluded, "[n]o system of immigration enforcement can run under these constraints." *Id.* at 163.

> **iv.    The system-wide costs of inferring a damages remedy counsel hesitation.**

Beyond the separation-of-powers concerns discussed above, multiple "problems of administrability" would flow from creating a damages remedy in this context. At the outset, and as detailed above, inferring a remedy in this context would slow down the streamlined removal process that Congress has established. The Supreme Court has long recognized the costs of disrupting removal proceedings with various constitutional challenges. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1048 (1984) ("The INS currently operates a deliberately simple deportation hearing system, streamlined to permit the quick resolution of very large numbers of deportation actions, and it is against this backdrop that the costs of the exclusionary rule must be assessed."). As the *Lopez-Mendoza* Court explained in holding that, generally, the exclusionary rule does not apply in civil removal proceedings, "[t]he prospect of even occasional invocation

of the exclusionary rule might significantly change and complicate the character of these proceedings." *Id.* Allowing Plaintiffs' claims to proceed under *Bivens,* essentially turning routine immigration matters into individual-capacity suits for money damages, raises similar concerns.

Additionally, in the context of immigration enforcement operations, claims similar to Plaintiffs' could readily be asserted by other aliens facing removal proceedings. Moreover, such claims—particularly to the extent they turn on ICE officials' motives—are relatively easy to plead and can be difficult to disprove. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[C]harges of racial discrimination . . . may be easy to make and difficult to disprove." (citation omitted)). Given that every single one of the approximately 61,000 removals performed last year involved a person from a foreign country, *see* Fiscal Year 2017 ICE Enforcement and Removal Operations Report, *available at* https://www.ice.gov/ removal-statistics/2017 (last visited Dec. 28, 2017), with at least the potential for equal protection claims, this could open the floodgates of litigation against ICE officials enforcing immigration laws. *Cf. Wilkie*, 551 U.S. at 561 (dismissing claims on special factors grounds in part because "a *Bivens* action to redress retaliation against those who resist Government impositions on their property rights would invite claims in every sphere of legitimate governmental action affecting property interests").

The outcome of this would be a marked increase in the number of personal-liability lawsuits filed against line-level ICE officials based on the circumstances surrounding arrests, the adequate defense of which "would impose an intolerable administrative burden on the immigration enforcement system." *Rajah v. Mukasey*, 544 F.3d 427, 447 (2d Cir. 2008) (discussing *Lopez-Mendoza*). As the Second Circuit noted, "officers may arrest several aliens per day" and therefore "cannot be expected to compile elaborate, contemporaneous, written reports

detailing the circumstances of every arrest." *Id. See also Lopez-Mendoza*, 468 U.S. at 1049-50

("The demand for a precise account of exactly what happened in each particular arrest would

plainly preclude mass arrests, even when the [agency] is confronted, as it often is, with massed

numbers of ascertainably illegal aliens, and even when the arrests can be and are conducted in

full compliance with all Fourth Amendment requirements."). Yet to defend the sort of lawsuit

Plaintiffs bring here—should it proceed beyond the pleadings stage—may require precisely that

sort of detail, short of a trial by jury solely to evaluate the credibility of an alien who, for

example, claims he did not give voluntary consent against the testimony of ICE officials who

claim he did. Balancing such concerns, and the related decision of whether to permit this class of

cases for money damages, belong to Congress, not the courts. *See Abbasi*, 137 S. Ct. at 1858.

> **v.   Additional practical effects of allowing Plaintiffs' suit to proceed counsel against implying a remedy.**

Lastly, at least one concrete, practical effect of allowing suits such as Plaintiffs' to

proceed strongly counsels against implying a damages remedy. Such suits may force the

Government to decide between on the one hand pursuing immigration removal proceedings

against unlawfully present aliens, or on the other, forcing line-level ICE officials who face

potential personal liability to effectively forego their entitlement to a qualified immunity defense

by subjecting them to cross-examination in an evidentiary hearing.

That is precisely the quandary the Government (and the Defendants) face in this very

case. As mentioned above, the original Plaintiffs have already raised constitutional claims nearly

identical to those here in their removal proceedings in motions to suppress evidence. Under

Fourth Circuit precedent, if an alien pleads an "egregious" Fourth Amendment violation, he or

she can obtain an evidentiary hearing. *See Yanez-Marquez*, 789 F.3d at 450-51. Should Plaintiffs

establish a *prima facie* case through their motions, Defendants would potentially face an evidentiary hearing at which they could be cross-examined by Plaintiffs' counsel—who also represents them in their removal proceedings, *see* Exs. 1, 2—about the very events underlying Plaintiffs' claims. And Defendants would face that cross-examination without their personal attorney, bound to protect their individual interests, *see* 28 C.F.R. § 50.15, to defend them.

Beyond the inherent injustice in such a scenario, it would enable Plaintiffs to circumvent Defendants' qualified immunity defense, which the Supreme Court has long held is meant to protect federal officials from the burdens of litigation, including discovery, in the absence of a clearly established constitutional violation. *See, e.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) ("*Harlow* and *Mitchell* make clear that the [qualified immunity] defense is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery' . . . ."); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of a violation of clearly established law, the defendant is entitled to qualified immunity before the commencement of discovery."); *see also Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 330 (4th Cir. 2009) (quoting *Mitchell*, 472 U.S. at 526). Not only would this give Plaintiffs two bites of the apple in their removal proceedings, it would give them two bites of the apple in their discovery into Defendants: one during immigration removal proceedings, and one during civil discovery. That simply cannot be right. And it certainly is not what *Bivens* was meant for.

In short, Plaintiffs' claims raise numerous separation-of-powers and system-wide administrability concerns, among other special factors. They also raise the prospect of Plaintiffs using this lawsuit as both a shield, potentially delaying their immigration removal proceedings, and as a sword, obtaining premature discovery against Defendants in this case. This Court should

26

not permit that, and should instead dismiss Plaintiffs' claims.

### III.    Defendants Are Entitled to Qualified Immunity.

Dismissal of Plaintiffs' *Bivens* claims is also warranted on the independent ground that Defendants are entitled to qualified immunity. The courts have long noted that individual-capacity actions like this one "entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citation omitted). To address those concerns, the Supreme Court established the defense of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Qualified immunity shields officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. The Supreme Court has emphasized that in order to ensure that qualified immunity shields officials from the fear of civil damages as well as the harassment of litigation, *Anderson*, 483 U.S. at 638, qualified immunity contains an "entitlement not to stand trial or face the other burdens of litigation." *Mitchell*, 472 U.S. at 526 (citation omitted). It is "an *immunity from suit* rather than a mere defense to liability." *Id.* Accordingly, the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (citations omitted).

Three components of qualified immunity come into play in this case: first, for Plaintiffs' constitutional claims to survive, they must allege facts "plausibly suggesting (not merely consistent with)" violation of a clearly established right. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). In evaluating the allegations, the Court must ignore "legal conclusions" stated in the complaint. *Walters v. McMahon*, 684 F.3d 435, 439 (4th Cir. 2012). After eliminating such

unsupported legal conclusions, the Court should ask whether Plaintiffs have proffered sufficient "factual allegations" against each Defendant to "advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). Although the "plausibility standard is not akin to a 'probability requirement,'" *id.*, an inference of misconduct may be rendered implausible when the allegations of misconduct are more likely explained by lawful behavior than by unlawful behavior. *See id.* at 679-80.

Second, qualified immunity is a "fair notice" requirement, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), which is intended to protect government officials from suit unless they are "plainly incompetent or . . . knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S 731, 743 (2011) (quotation omitted); *see also Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (granting qualified immunity in the § 1983 context). Qualified immunity "gives ample room for mistaken judgments" and "protects public officials from bad guesses in gray areas." *Durham v. Horner*, 690 F.3d 183, 190 (4th Cir. 2012) (internal quotations and citations omitted). For a right to be clearly established, it must be adequately developed by existing law so as to provide an official with sufficient guidance: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The illegality of the officer's actions must, in the light of pre-existing law, be "beyond debate." *al-Kidd*, 563 U.S. at 741. The Supreme Court has "repeatedly" implored lower courts "not to define clearly established law at a high level of generality." *Id.* at 742 (citations omitted). *See also Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017) ("[I]t is a longstanding principle that clearly established law should not be defined at a high level of generality." (internal quotation

and citation omitted)).

And third, qualified immunity applies unless a plaintiff alleges that a defendant personally participated in a clearly established constitutional violation. *See Iqbal*, 556 U.S. at 672-75 (finding appellate jurisdiction for denial of claim to qualified immunity that was based on failure to plead allegations of personal participation in alleged constitutional violations). As the Supreme Court explained in *Iqbal*, to state a claim under *Bivens*, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Government officials cannot be held liable for the misconduct of other government officials. *See id.* Accordingly, where plaintiffs sue a number of Government officials in their individual capacities, "it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). *See Evans v. Chalmers*, 703 F.3d 636, 661 (4th Cir. 2012) (citing and quoting *Iqbal* and *Robbins* in concurring with dismissal of claims against government officials for whom no specific allegations were raised) (Wilkinson, J., concurring); *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 626 (W.D. Va. 2015) ("In the Fourth Circuit and elsewhere, courts have interpreted *Twombly* and *Iqbal* to mean that generic or general allegations about the conduct of 'defendants,' without more, fail to state a claim." (citations omitted)). This Court should grant qualified immunity to Defendants because Plaintiffs have failed plausibly to allege that each Defendant personally participated in a violation of a clearly established constitutional right.

### A. The Original Plaintiffs fail to allege that Defendants committed a clearly established Fourth Amendment violation during the February 17 incident.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const.

amend. IV. Law enforcement officers are permitted to conduct an investigatory stop if they have a "reasonable and articulable suspicion that the person seized is engaged in criminal activity." *See United States v. King*, 119 F.3d 290, 294 (4th Cir. 1997) (quoting *Reid v. Georgia*, 448 U.S. 438, 400 (1980)). "A reasonable, articulable suspicion is a particularized and objective basis for suspecting the person stopped." *King*, 119 F.3d at 294 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Assuming that the original Plaintiffs' factual allegations are correct for the purposes of this dispositive motion only, Defendants concede that the original Plaintiffs have pled that an investigatory stop occurred when the original Plaintiffs' vehicle was blocked by an SUV in the early morning hours of February 17. *See* FAC ¶ 56; *United States v. Jones*, 678 F.3d 293, 300-01 (4th Cir. 2012).

But it certainly was not clearly established that the stop was unreasonable or that Defendants had no "particularized and objective basis for suspecting" the occupants of the vehicle and stopping it. According to Plaintiffs' own complaint, Defendants were searching for adult male suspects who had lived in the apartment complex at which the stop occurred. *See* FAC ¶ 63. Not only that, the suspects had lived in the very apartment the original Plaintiffs left as they went to their vehicle early that morning. *Id.* Moreover, the stop occurred at 6:25 a.m., *id.* ¶ 55, roughly thirty minutes before sunrise, in the heart of winter. [10]

Under such circumstances, Defendants had a "particularized and objective basis" to stop the original Plaintiffs' vehicle to ascertain whether any of the four adult male occupants in fact

---

[10] Courts may take judicial notice of such undisputed facts as the time of sunrise on a certain date. *See Davis v. United States*, No. 1:07-cr-254, 2011 WL 13192740, at *3 (E.D. Va. Dec. 15, 2011). According to *The Old Farmer's Almanac*, on February 17, 2017, sunrise in Annandale, Virginia, was at 6:55 a.m. *See* https://www.almanac.com/astronomy/rise/VA/Annandale/2017-02-17. Plaintiffs' assertion that the time of the alleged seizure was "a mere five minutes before the start of civil twilight," FAC at 13 n.2, simply reinforces the fact that the seizure occurred well before sunrise in the depth of the winter.

were the adult male suspects Defendants sought. *See Taft v. Vines*, 70 F.3d 304, 312 (4th Cir.

1995) (officers had reasonable suspicion to stop vehicle that left mobile home park where

suspected murderer resided), *reh'g granted, opinion adopted in relevant part en banc*, 83 F.3d

681, 683-84 (4th Cir. 1996) (per curiam). At bare minimum, it was not clearly established they

had no lawful basis for stopping the vehicle. That none of the occupants turned out to be the

suspects is irrelevant. *Id.* ("[T]he mistaken seizure of an individual is not pertinent to a proper

qualified immunity analysis.").

Once the Defendants had a basis for stopping the vehicle on suspicion of containing

criminal aliens, they were entitled to ask the occupants for their identification and their

immigration status. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) ("[W]hen an

officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens

who are illegally in the country, he may stop the car briefly and investigate the circumstances

that provoke suspicion."). As the Court added in *Brignoni-Ponce*, "[t]he officer may question the

driver and passengers about their citizenship and immigration status . . . ." *Id.* That one of the

vehicle occupants could not produce identification, FAC ¶ 60, would not serve to allay any

suspicion Defendants had. Moreover, the original Plaintiffs make no mention of what sort of

identification they produced—or of their actual citizenship or status to be in the United States,

for that matter. *See generally* FAC. Such "evasive pleading," *De La Paz*, 786 F.3d at 370 n.2,

cannot skirt the fact that the original Plaintiffs themselves, in their own motions to suppress filed

in their removal proceedings, do not contest that they indeed are aliens who do not have legal

status to remain in the United States. *See generally* Exs. 1, 2. Once this fact was established, be it

at the vehicle when officers first asked for identification, or in the apartment they returned to

after an occupant failed to produce any, all possible Fourth Amendment concerns disappeared.

In sum, the original Plaintiffs have failed to allege that Defendants violated a clearly established Fourth Amendment right. This Court should therefore dismiss the original Plaintiffs' Fourth Amendment claim because Defendants are entitled to qualified immunity.

**B. The newly added Plaintiffs have failed to allege which Defendants, and how each Defendant, personally participated in the alleged events of February 8, 2017.**

The newly added Plaintiffs' Fourth Amendment claim fails to state a claim because their allegations do not specify which of the five Defendants was involved in the February 8, 2017 alleged incident, and also do not explain who is alleged to have done what to whom. Although the FAC contains specific factual allegations of certain discrete acts occurring early on February 8, including encounters with individuals, statements to inhabitants of the house in Arlington, and other discrete acts, the FAC does not say which of the five Defendants were at all allegedly involved in these acts. *See* FAC ¶ 20. Nor does it specifically identify any individual Defendant as having allegedly committed any act on February 8. Instead, the FAC refers variously to "four Defendants," FAC ¶ 20; "three Defendants," *id.* ¶ 28; "two Defendants," *id.* ¶ 29; "[o]ne," "a," or "the" "Defendant," *id.* ¶¶ 23, 29, 32, 36-42, 46-48; or just "Defendants," *id.* ¶¶ 21-22, 25-28, 31, 34-36, 43-46. Indeed, there is not a single specific allegation in the FAC naming a specific Defendant. *See generally*, FAC.

But such allegations against a vague set of "Defendants" in an individual-capacity suit against five individuals are insufficient to state a *Bivens* claim under basic pleading standards. *Marcantonio v. Dudzinski*, a common-law tort action, illustrates this point. In *Marcantonio*, a first-year student on the University of Virginia's swim team sued five more senior swimmers for allegedly hazing him, listing a series of factually detailed, explicit, discrete acts the defendants purportedly committed. *See Marcantonio*, 155 F. Supp. 3d at 623-25 (summarizing allegations).

Yet the court found that allegations against "defendants" that failed to specify which of the five defendants committed the alleged act were insufficient, even though the facts alleged were themselves detailed. *See id.* at 626 (dismissing all claims against defendant for whom no specific allegations were raised against him by name); *see also Butler v. Bank of Am., N.A.*, 690 F.3d 959, 961 (8th Cir. 2012) (dismissing claims against law firm where no allegations specified its involvement in fraud but complaint contained general allegations against "defendants"); *Bryson v. Gonzales*, 534 F.3d 1282, 1290 (10th Cir. 2008) (noting that generic claims against "defendants" did not assist in determining which factual allegations were pled against police chief defendant); *Raub v. Bowen*, 960 F. Supp. 2d 602, 616 (E.D. Va. 2013) (dismissing false imprisonment claim against unspecified defendants were claims brought against "one or more Defendants—including but not limited to" two other specified defendants).

Here, like in *Marcantino*, the newly added Plaintiffs bring tort claims against five Defendants and plead discrete factual events, yet fail to specify which of the "Defendants" is alleged to have done what to whom. As with the plaintiff in *Marcantino* who failed to state claims against a defendant who was not specifically alleged to have committed the underlying tortious acts, the newly added Plaintiffs fail to state a claim against Defendants.

This applies all the more so to the newly added Plaintiffs' allegations, which paint a vague, confusing, and often contradictory picture of how many "Defendants" were allegedly involved in many of the discrete acts pled. For example, the newly added Plaintiffs assert that "four Defendants" participated in the February 8 operation, FAC ¶ 20. Yet after alleging that "three Defendants" remained in the basement of the house, *id.* ¶ 28, Plaintiffs claim that "two Defendants" then went upstairs to the second floor, raising to five the number of "Defendants" purportedly involved. *Id.* ¶¶ 29-30. But when those "two Defendants" returned to the first floor

(not the basement), "several armed Defendants" already awaited them, *id.* ¶ 40, while

"Defendants" still remained in the basement. *Id.* ¶ 44. That puts the total number of

"Defendants" participating in the incident at seven—if not more. In a constitutional tort

complaint against five ICE officers in their individual capacities, "such vagaries," *Raub*, 960 F.

Supp. 2d at 616, will not do. This Court should therefore dismiss the newly added Plaintiffs'

Fourth and Fifth Amendment claims against Defendants.

### C.  All Plaintiffs have failed adequately to plead a violation of the Fifth Amendment.

Relatedly, this Court should dismiss Plaintiffs' equal protection claim because they have

failed to allege a plausible violation of their Fifth Amendment rights, not to mention a clearly

established violation. In effect, their equal protection claim is a selective prosecution claim in

that they assert the Government has selected to enforce immigration laws against them based on

their race and ethnicity, while not doing so to unlawfully present aliens of other races and

ethnicities. "As a general matter . . . an alien unlawfully in this country has no constitutional

right to assert selective enforcement as a defense against his deportation." *AADC*, 525 U.S. at

488. Thus, it is not clearly impermissible for the United States to take into account an alien's

national origin in removal proceedings. Although in the criminal context, a decision to prosecute

aliens of a certain race and ethnicity in a discriminatory manner or based on a discriminatory

animus would likely be unlawful, *see United States v. Armstrong*, 517 U.S. 456, 464 (1996),

even in that context, to state such a claim in criminal proceedings, a plaintiff "must establish that

(1) similarly situated individuals of a different race were not prosecuted; and (2) that the decision

to prosecute was invidious or in bad faith." *United States v. Braddock*, 410 F. App'x 587, 589

(4th Cir. 2011) (per curiam) (internal quotation marks and citations omitted). *See also United

States v. Nicolas-Juan*, 426 F. App'x 154, 155 (4th Cir. 2011) (per curiam) (dismissing equal

protection claim because criminal alien was "not similarly situated with non-criminal aliens").

Plaintiffs—who face immigration removal proceedings, which are civil, and not criminal proceedings—fail plausibly to allege either of the criteria they would need to plead even if prosecuted. First, they have not alleged that Defendants failed to question or detain other similarly situated aliens of a different race or ethnicity. Their assertions that "[t]he neighborhoods where ICE targeted Plaintiffs have a higher concentration of people with Latino ethnicity than other neighborhoods in the vicinity," FAC ¶ 71, is irrelevant because the correct inquiry focuses on how similarly situated aliens are treated, not on the specific ethnic composition of one locale. *See Armstrong*, 517 U.S. at 464. And Plaintiffs simply have not alleged that similarly situated unlawful aliens located in Alexandria or Annandale who are not of Latino ethnicity have been treated differently than Plaintiffs. *See generally*, FAC. Nor have they alleged that other locales with a lower concentration of people with Latino ethnicity have seen a significantly lower frequency of ICE operations to locate unlawful aliens.

Even if Plaintiffs had adequately alleged that they were treated differently than similarly situated unlawful aliens, their allegations of discriminatory intent are wholly conclusory. Their claim that Defendants detained them "solely based on" their "apparent race, ethnicity, or perceived national origin," FAC ¶¶ 72, 81, is just the sort of "formulaic recitation of the elements of a cause of action" that this Court must ignore. *Iqbal*, 556 U.S. at 662. *See Aguilar v. ICE*, 811 F. Supp. 2d 803, 820 (S.D.N.Y. 2011) (dismissing equal protection claim where plaintiffs alleged that officials "intended to violate constitutional rights").[11]

---

[11] The newly added Plaintiffs' allegation that a "Defendant" asked whether "other 'Spanish families'" lived nearby, aside from applying only to the alleged February 8 operation, does not state a claim because it fails to specify who allegedly made that comment. *See supra* Part III.B. In any event, in the context of looking for the individual they sought, such a statement would not state the violation of a clearly established constitutional right.

Moreover, even based on the few facts actually pled, their claims simply are implausible. The original Plaintiffs' bare assertion that Defendants detained and questioned them "solely based on their apparent race, ethnicity, or perceived national origin," FAC ¶ 81, is belied by a more plausible explanation. Namely, Defendants detained and questioned Plaintiffs because in the early morning hours, they left the apartment where suspected criminal aliens Defendants were searching for had lived. *Id.* ¶ 63. And, as it turned out, Plaintiffs were undocumented aliens and could not establish lawful presence.

Similarly, the newly added Plaintiffs' claims that Defendants detained and questioned them "solely based on" their "apparent race, ethnicity, or perceived national origin," FAC ¶ 72, is implausible when considering that at least one individual of that same "apparent race, ethnicity, or perceived national origin," *id.*, was not arrested—namely, Cárcamo. Moreover, although the FAC makes no mention of the ethnicity of the various female individuals encountered during the February 8 operation, it is noteworthy that none of those women were detained or questioned. Instead, adult males (like the individual that Defendants sought) who were unable to establish their lawful presence in the United States, were questioned and detained. As between the "obvious alternative explanation" for the detention and questioning of all the Plaintiffs and "the purposeful, invidious discrimination" Plaintiffs asks this Court to infer, "discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682. Undertaking the task of removing unlawfully present aliens, the very job Defendants were hired to do, certainly does not violate any clearly established right.[12]

-----

[12] Because Plaintiffs' *Bivens* claims fail, their claim for declaratory relief must be dismissed as well. The Declaratory Judgment Act, 28 U.S.C. § 2201 (DJA), does not provide a cause of action. "It is a well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (internal

**CONCLUSION**

Plaintiffs' suit attempts to stymie their immigration removal proceedings and to alter the perceived immigration enforcement policies of the Executive Branch. Congress and the Supreme Court have both weighed in against such attempts in the context of an individual damages claim. For these reasons and those stated above, this Court should dismiss Plaintiffs' First Amended Complaint.

---

citations, quotations, and alterations omitted). "Rather, the availability of declaratory relief presupposes the existence of a judicially remediable right." *Id.*; *see also Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 619 (4th Cir. 1997) ("[T]he DJA does not provide a source of jurisdiction which is independent of substantive federal law.").

DATED this 2nd day of January, 2018.

                                   Respectfully submitted,

                                   CHAD A. READLER
                                   Acting Assistant Attorney General
                                   Civil Division

                                   DANA J. BOENTE
                                   United States Attorney
                                   Eastern District of Virginia

                                   C. SALVATORE D'ALESSIO, Jr.
                                   Acting Director, Torts Branch

                                   MARY HAMPTON MASON
                                   Senior Trial Counsel

                                           /s/
                                   DENNIS C. BARGHAAN, JR.
                                   Deputy Chief, Civil Division
                                   Assistant U.S. Attorney
                                   2100 Jamieson Avenue
                                   Alexandria, Virginia 22314
                                   Telephone: (703) 299-3891
                                   Fax: (703) 299-3983
                                   E-Mail: dennis.barghaan@usdoj.gov

                                   Paul E. Werner
                                   Trial Attorney
                                   Civil Division, Torts Branch
                                   P.O. Box 7146 Ben Franklin Station
                                   Washington, D.C. 20044
                                   Telephone: (202) 616-4152
                                   Fax: (202) 616-4134
                                   E-Mail: paul.werner@usdoj.gov

                                   Attorneys for the Defendants

38

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2018, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send notification of this filing to:

Simon Y. Sandoval-Moshenberg
VA Bar No. 77110
Nicholas Marritz
VA Bar No. 89795
Legal Justice Aid Center
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Telephone: (703) 720-5605
E-Mail: simon@justice4all.org; nicholas@justice4all.org

Daniel E. Johnson
VA Bar No. 88696
Mark H. Lynch (*pro hac vice*)
Jose E. Arvelo (*pro hac vice*)
Brandon H. Johnson (*pro hac vice*)
Daniel T. Grant (*pro hac vice*)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5224
E-Mail: dejohnson@cov.com

/s/
DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
E-Mail: dennis.barghaan@usdoj.gov

39